### NATUS CORPORATION
v.
### The UNITED STATES.
No. 166–61.

United States Court of Claims.
Jan. 20, 1967.

Robert Martin, Washington, D. C., for plaintiff; Marx Leva, Washington, D. C., attorney of record; Richard Shlakman and Fowler, Leva, Hawes & Symington, Washington, D. C., of counsel.

Alfred H. O. Boudreau, Jr., Washington, D. C., with whom was Acting Asst. Atty. Gen., J. William Doolittle, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

COLLINS, Judge.

On June 6, 1952, plaintiff (then the United States Radiator Corporation) contracted with the United States Army Corps of Engineers for the production and delivery, in monthly quantities, of approximately 18,000,000 square feet of portable steel airplane landing mat. The total price was approximately $8.5 million, based upon a price of $0.474 per square foot. The complaint, brought here from an adverse decision of the Armed Services Board of Contract Appeals (hereinafter the "Board"), seeks to recover certain additional expenses sustained during manufacture by way of an equitable adjustment in the contract price. The theory advanced in support of the claim is that the contract drawing embodied a misrepresentation in that adherence to it could not be achieved through any commercially practicable means.

The elements of the claim embrace two distinct issues—the first relating to

an interpretation of contract specifications; the second to the issue of impossibility of performance. Both present questions of law which we may freely reexamine—the Board's decision on these matters being neither final upon plaintiff nor binding upon this court. Jack Stone Co. v. United States, 344 F.2d 370, 170 Ct.Cl. 281 (1965); Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972, 169 Ct.Cl. 384 (1965). We sustain the Board's decision.

The landing mat that plaintiff was required to produce (designated the "M-8 mat") was a new product which the Corps of Engineers developed over a period of 3½ years. Designed to support heavy aircraft in takeoff and landing operations, this mat, unlike those of earlier design (in use during World War II and the Korean conflict), contained a fastening device which permitted the interlocking of each 12-foot panel so as to form a steel surface, continuous and unbroken in length. The removal of tire hazards, as well as increased mat life, was achieved by eliminating—through the locking mechanism—the problem of end curling found in previous panel assemblies.

Each mat (or panel) was to be fabricated from a flat sheet of steel about ⅛ inch thick, approximately 12 feet long, and 1½ feet wide. When finished, the sheet was to contain four deep, U-shaped, lengthwise corrugations or channels, with each channel wall being pierced at its ends. Assembly of a continuous steel surface was to be achieved by placing the male end of a mat over the female end of the adjoining mat and aligning them so as to permit the insertion of a cross member (designated as an end connector or locking "7") through the pierced slots. The U-shaped channels and means of end connection, which together constitute the design advance noted, are likewise the focal point of this controversy.

Government experimentation with the subject mat began in June 1949, when it let a development contract to United Steel Fabricators for the production of 10,000 square feet at a unit price of over $1 per square foot. The tools for this production, which United Steel made for itself, were adaptable to only one sequence of operation, that being a piercing of the end-connector slots before formation of the longitudinal channels (termed the "pierce-before-forming" method). The subsequent channel formation was accomplished through the use of press brakes. Identical production methods were used by the Government's second experimental contractor—Highway Steel Products—in its three contracts for 225,000 square feet, which that company bid at prices ranging from $0.71 to $0.90 per square foot.

Neither United Steel nor Highway Steel Products employed a mass-production method in its development of the prototype mats. Highway's rate of production was 384 square feet per hour (approximately 20 mats per hour) and, despite this slow output rate, considerable difficulty was experienced with the end-connector slots. The Government accepted Highway's production without regard to specification tolerances so long as hand assembly showed the mats to fit together. Upon completion of this experimental program, the Corps of Engineers classified the mat as a standard item of manufacture, the drawing here in question having been reviewed and approved as ready for utilization in a competitive procurement program.

On January 16, 1952, 5 months prior to the award of the subject contract, plaintiff was awarded a contract for the furnishing of 1,100,000 square feet of a landing mat essentially identical to the one in issue, except for the fact that it called for a slightly lighter steel, i. e., 11-gauge as opposed to the subject contract which utilized 10-gauge steel. The intervention of a steel strike and the low priority allotted to the landing-mat program during the Korean emergency resulted in the deferment of production under the 11-gauge contract until the latter part of 1952. As a consequence of this, plaintiff had little opportunity to gain fabrication experience in M–8 mat pro-

duction at the time of its bidding on the contract here in issue.

When production of the 11-gauge contract (this being the forerunner to the present contract) was finally undertaken in October 1952, plaintiff experienced much the same difficulties that had plagued Highway Steel Products. In addition to being aware that a pierce-before-forming method had been utilized in the prototype manufacture, plaintiff also interpreted the specifications as calling for this production sequence. From the very beginning of production under the 11-gauge contract, the slots were a major problem. The press-brake-channel-forming operation dislocated and distorted the pierced slots and cracked the steel. The prescribed tolerances could not be achieved and performance under the contract could be accomplished only under relaxed standards. Plaintiff found that strict adherence to prescribed tolerances led to a rejection rate in excess of 50 percent of the mats actually produced. The Government accommodated this problem in much the same manner that it had with its experimental contractors—by accepting those mats which hand fitting showed to be compatible.

Performance of the present contract was undertaken in June 1953, after completion of the previously discussed 11-gauge contract. And like its predecesor, this contract was also fraught with numerous engineering difficulties.

At the time plaintiff submitted its bid in May 1952, it planned to rely upon a pierce-before-forming sequence. But instead of using press brakes in the rib formation, it contemplated using the only other alternative, namely, a rolling machine. This approach was decided upon not because plaintiff realized the defects attendant to the press-brake method (of which, at the time, it had no knowledge), but because a rolling-machine operation was, in theory at least, more adaptable to mass production from the standpoints of efficiency, costs, and quality of end product. Unfortunately, what appeared sound in theory proved unattainable in practice.

The specially built rolling machine, which was put into operation in April 1953 and which was then used to complete the earlier 11-gauge contract, was as inadequate for mass production as the prior press-brake method had proven to be. It was found that, in high-speed production, the pierced slots were destructive of the roller surfaces, tolerances could not be maintained, proper slot alignment could not be achieved, and cracking of the metal could not be eliminated. Thus, performance of the present contract began under the most disadvantageous of circumstances. Neither the press-brake method nor the rolling machine could be counted on to operate satisfactorily in a high-speed-production process, at least when manufacture was confined strictly to the drawing configurations.

Fully apprised of the difficulties facing it, plaintiff turned first to the steel manufacturers, inquiring of them whether the problems could be overcome through changing the grade of steel. The response to this was in the negative. Plaintiff then sought and obtained from the Government a temporary relaxation of tolerances similar to that which had been granted the company under the 11-gauge contract. Advice was also sought from tool and die firms concerning the feasibility of producing the slots with horizontal parallel surfaces in a punch-after-forming sequence rather than with a tapered upper surface in a pierce-before-forming sequence. These firms declined to undertake to make the tools or dies, giving as their reason the fact that this method was unworkable because of the location of the slots and the cramped space between and within the channels. Finally, plaintiff turned to metal fabrication experts for assistance. These experts, in addition to recommending reorganization of plaintiff's production line so as to include automatic conveying and handling equipment, advised plaintiff to adopt a pierce-after-forming sequence with the slots to

have parallel upper and lower slopes at an approximate 30° angle to the horizontal plane.

In order to avoid termination for default and convinced from its experience that performance was impossible under the methods initially contemplated, plaintiff sought authorization to pierce the slots with a different configuration from that originally specified. Permission to so proceed was granted in February 1954 and thereafter plaintiff was able to fulfill its contract obligation—the prior high (50 percent) rejection rate stemming from tolerance difficulties no longer being a problem.

On December 30, 1955, plaintiff requested a change order, pursuant to the "Changes" article, seeking an equitable adjustment in the contract price. This was denied by the contracting officer on November 23, 1956, on the ground that the allowed deviation from the contract drawing was not indicative of an error in the contract drawing, but was granted simply to permit plaintiff to expedite its own performance. Thus, the question presented is whether plaintiff's failure to achieve satisfactory performance was due to its own inadequacy or to an inadequacy in the contract drawing. Despite a most persuasive presentation, we are forced to conclude that plaintiff is not entitled to recover.

The heart of plaintiff's case rests upon two contentions: First, that the contract drawing, by depicting an angle resulting from a pierce-before-forming sequence, impliedly represented the feasibility of such a production sequence and, secondly, the fact that production geared to a pierce-before-forming operation was impossible to attain through any commercially practicable means. Taken together, these contentions allegedly justify relief under the doctrine of legal impossibility.

■■ There would seem to be little basis for disputing the first of plaintiff's propositions. While the drawing in question purported to be no more than an end-product drawing, the record offers convincing proof that the end-connector slots [1] were standardized depictions of angles obtained through pierce-before-forming operations. Given this fact, we readily accept plaintiff's contention that it was reasonable for it to assume that the angle shown could be made in the manner shown. The fact that the contract did not expressly direct the method of manufacture would offer defendant little aid. The drawing, by clearly depicting a production sequence (i. e., piercing before forming), communicated with as much certainty as the spoken word. Thus plaintiff's argument that it was reasonable for it to have assumed the feasibility of fulfilling performance through a pierce-before-forming operation is a point well taken. Furthermore, we see no reason for excepting the present situation from the long adhered to principle that, where the Government authors the specifications, it warrants that, if they are complied with, satisfactory performance will result. United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918); R. M. Hollingshead Corp. v. United States, 111 F.Supp. 285, 124 Ct.Cl. 681 (1953). That warranty speaks not only to the contractor's right to assume that the end product will perform satisfactorily, it includes as well his right to rely upon the *indicated method* of manufacturing the end product. In short, it means that the product shown can be made in the manner shown. For these reasons, we would uphold the reasonableness of plaintiff's action in seeking to achieve production through a pierce-before-forming operation.

This then brings us to the second of plaintiff's contentions, namely, its claim that the difficulties experienced in manufacture would justify the court's concluding that performance was legally impossible. Though fully mindful of the problems that plaintiff experienced in its abortive efforts to accomplish a successful pierce-before-forming operation,

---

**1.** The reference here is to those angles which were located in the unexpanded portion of the rib, designated on the contract drawing as angles E–E and F–F.

we must nevertheless reject its contention that performance was legally impossible.

■ In taking this position, we readily concede that the doctrine of legal impossibility does not demand a showing of actual or literal impossibility.

■ Removed from the strictures of the common law, "impossibility" in its modern context has become a coat of many colors, including among its hues the point argued here—namely, impossibility predicated upon "commercial impracticability." This concept—which finds expression both in case law, see Hol-Gar Mfg. Corp. v. United States, 175 Ct.Cl. 518, 526, 360 F.2d 634, 639 (May 1966) (concurring opinion Judge Davis); United States v. Wegematic Corp., 360 F.2d 674 (2d Cir.1966); and in other authorities, Restatement, Contracts § 454 (1932); Uniform Commercial Code § 2–615 (Comment 3)—is grounded upon the assumption that in legal contemplation something is impracticable when it can only be done at an excessive and unreasonable cost. As stated in Transatlantic Financing Corp. v. United States, 363 F.2d 312, 315 (D.C. Cir.1966):

* * * The doctrine ultimately represents the ever-shifting line, drawn by courts hopefully responsive to commercial practices and mores, at which the community's interest in having contracts enforced according to their terms is outweighed by the commercial senselessness of requiring performance. * * *

In seeking to bring itslf within the reach of this concept, plaintiff's implicit premise is that commercial practicability ceases where the demands of mass procurement can no longer be satisfied through the means of mass production. Stated simply as a generalized proposition, we find little difficulty in accepting this. But the application of that proposition to the facts in this case leaves something to be desired.

Plaintiff has argued that its experience with the use of both a press brake and a rolling machine conclusively demonstrates that neither of these could be employed to successfully mass produce the subject mats if a pierce-before-forming operation were to be employed. Predicated simply upon plaintiff's *own* difficulties, the statement is eminently correct. But, like the Board, the difficulty we find in this is that plaintiff's case, when evaluated in light of the record, appears to be more a matter of subjective limitation, rather than objective impossibility.

Two distinct facts appear. First, the testimony of a number of witnesses who stated, in effect, that there existed no commercially practicable manner by which the subject mats could be made if production were restricted solely to a pierce-before-forming operation. Secondly, the testimony of a highly credible witness, who testified that, while there existed no commercially feasible method of achieving high-speed production through the use of press brakes, nevertheless a modified press-brake operation (i. e., one involving manual indexing with each mat rib being formed one at a time) could be utilized to achieve a maximum output of 40–45 mats per hour.[2] This suggested method would require a crew of three to five men per machine, and while it would involve other problems (which the witness did not specify), he conceded that the method he proposed could readily be extended, i. e., increased production could be achieved simply by increasing the number of press brakes. With these essential facts before it, the Board concluded that neither legal impossibility nor commercial impracticability had been shown. In this we must concur.

■ Nothing in the record discloses any basis for rejecting the feasibility of

2. This should be compared with plaintiff's estimated production of 212 mats per hour using a rolling machine with two lines and a double-shift operation. The estimated output of 40–45 mats per hour, referred to above, is based upon the use of one press brake operating on a single shift.

accomplishing performance through the suggested modified press-brake operation. The law excuses performance (or, in the case of Government contracts, grants relief through a change order) where the attendant costs of performance bespeak commercial senselessness; it does not grant relief merely because performance cannot be achieved under the most economical means.

■■ Plaintiff's contention that the Government impliedly warrants the commercial practicability of its specifications adds no new dimension to the law of legal impossibility. Whether the concept of legal impossibility be justified through the fiction of an implied warranty, or predicated simply upon the objective reality of excusing performance because of exorbitant and unforeseeable expenses—in neither case would it entitle a contractor to relief merely because he cannot obtain a productive level sufficient to sustain his anticipated profit margin. *Plaintiff has not shown that the modified press-brake operation would be economically unrealistic.* The record offers no basis for permitting us to reject the practicability of this modified operation and, lacking such evidence, we can only presume that it would have been more costly than any other approach—but nevertheless well within the state of the art. Nor are we told why this modified operation should not be regarded as mass production. Certainly an output of 40 mats per hour on one machine is far removed from production which relies completely upon manual operations. That this rate of output was far less than was planned only establishes the measure of plaintiff's miscalculations, but offers no justifiable basis for holding that performance should be considered legally impossible.

In this connection, we would point out that plaintiff's decision to employ a roller method with which to achieve its calculated production rate was a wholly unilateral decision. The Government did not in any way represent that such a scheme would be workable; plaintiff relied completely upon the advice that it received from the rolling machine manufacturer. This fact assumes significance because, as the record shows, plaintiff also submitted an alternative bid—one in which it bid on 5 million square feet (as opposed to the present contract calling for 18 million square feet) at a cost of $0.649 cents per square foot and which it intended to fulfill through the use of press brakes.

This alternative bid was premised upon an estimated output of 78 mats per hour—a fact which shows quite clearly that plaintiff recognized press-brake production to be a much slower process than the method that it decided to use on the present contract. Faced with two distinct production approaches, i. e., a roller method or a press brake, plaintiff chose what in theory appeared as the more realistic. In doing this, it saddled itself with a production burden far greater than anticipated. But the existence of a known alternative approach precludes us from saying that the difficulties experienced should not have been foreseen. A reasonable bidder may think in terms of the most efficient method, but business acumen also demands that he acknowledge the possibility that fulfillment of his contractual obligations might require a departure from the least costly to the most costly means of operation. In either case, in legal contemplation the essential nature of the promised performance remains unchanged.

Plaintiff now argues that even the use of press brakes would have proven entirely unsatisfactory. But this argument, as we have already indicated, seems in large part dissipated by the fact that the record contains uncontradicted evidence regarding the feasibility of using press brakes—though perhaps under a slower and more costly method of operation.

■ Given the fact that the quantity to be manufactured was purely a matter of the contractor's own discretion, we can come to no other conclusion than that it took a calculated risk, the unfortunate consequence of which it must now bear alone. And this holds true even

458

if we accept plaintiff's argument that the contract drawing directed but one method, namely, a pierce-before-forming operation. The Government does not, when it directs the method of manufacture, warrant that its method can be pursued without difficulty or other unanticipated problems. The warranty, properly construed, promises only that performance is possible and within the state of the art. How that performance shall be achieved, or at what price, is a matter properly reserved for the contractor, and he may claim a breach of warranty only if the specified method demands resort to the economically unrealistic. The warranty is not breached when performance simply becomes more costly than anticipated. In short, the Government does not guarantee the contractor's profit.

■ Reliance upon Helene Curtis Indus., Inc. v. United States, 312 F.2d 774, 160 Ct.Cl. 437 (1963), would seem to add little to this case. There we held that when the Government possesses vital information, indispensable to satisfactory performance under the contract, which knowledge the contractor had no means of ascertaining and which it would not have assumed in light of deceptively worded specifications, then under such circumstances a duty of disclosure existed. In the present situation, the Government had no superior knowledge. Its 3½ years of experimentation, while confined to a pierce-before-forming production, was restricted entirely to prototype manufacture and did not involve mass-production techniques. It would be most unrealistic for us to translate the Government's limited experience into the type of superior knowledge upon which the *Helene Curtis* doctrine rests.

■ Similarly, we find inapposite the "mutual mistake" doctrine set forth in National Presto Indus., Inc. v. United States, 338 F.2d 99, 167 Ct.Cl. 749 (1964) cert. denied, 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965), relied upon by our commissioner and now advanced as an alternative theory by plaintiff.

The linchpin of our decision in that case is to be found in the Government's active participation in the precontract negotiations wherein the parties *mutually* agreed to the exclusion of certain equipment later found to be indispensable to satisfactory production. The expenses which plaintiff sustained, attributable directly to the unanticipated problems resulting from the absence of the necessary turning equipment, were relieved, in part, through our application of the mutual mistake concept. And in reaching that result, we noted that plaintiff's commitment to a fixed-price contract strongly suggested that it had assumed all the uncovered risks inherent in its promised performance—this obstacle being overcome only because a review of the parties' dealings as a whole convincingly demonstrated *the mutual contemplation (and error)* respecting the need for turning equipment or the time in which such need would become known.

Our characterization of the contractual relation as a "joint enterprise" was predicated in large measure upon the fact that the Government was as interested in the development of a new manufacturing process as it was in the end product, and further, that the untried method of production which plaintiff had embarked upon was the immediate result of the Government's active promptings. In *National Presto* it was also the Government's contractual responsibility to furnish the necessary equipment, a consideration totally lacking here.

Apart from the fact that the landing mat was a new product, we find nothing in the present factual pattern which would support our finding that the mistake made here was a mutual one. As pointed out, plaintiff's decision to use a rolling machine was wholly unilateral—the Government at no time expressing any views as to how production should proceed. Furthermore, the question as to what quantity should or could be produced was left entirely to the contractor's judgment. Under these circumstances, we find that plaintiff's accept-

ance of a fixed-price contract forecloses any possibility of expense allocation along the lines of mutual mistake.

In summary then, we take the position that while plaintiff's interpretation of the contract drawing was reasonable—meaning that it could legitimately have construed the drawing as a representation inviting the use of a pierce-before-forming sequence—such a representation is breached only if performance becomes legally impossible. The drawing set forth no additional information other than the indicated pierce-before-forming method. Beyond that, all else must rest with the contractor—his competence, capacity, and know-how being the sole determinants of the bid submitted.

As to the remaining issue, that is, defendant's contention that the present claim is barred by the statute of limitations, we consider this point to have been fully answered in Nager Electric Co. v. United States, 368 F.2d 847, 177 Ct.Cl. —— (Oct. 1966). The Board's decision in this case was not rendered until October 21, 1959; the present appeal was therefore timely. *Nager Electric, supra,* at 866.

For the reasons stated, we affirm the Board's decision, plaintiff's motion for judgment of liability is denied, defendant's motion to dismiss is granted and plaintiff's petition is dismissed.

DAVIS, Judge (concurring):

I join, in general, in the court's discussion of plaintiff's failure to show that performance was legally impossible, but I find it unnecessary to decide whether, in the particular circumstances,[1] the defendant represented the feasibility of using the pierce-before-forming method for mass-production of the mats. As for the type of mutual mistake remedied in National Presto Indus., Inc. v. United States, 338 F.2d 99, 167 Ct.Cl. 749

(1964), cert. denied, 380 U.S. 962, 85 S. Ct. 1105, 14 L.Ed.2d 153 (1965), for me it is enough that that case involved, and this one does not, (a) a "joint-enterprise" experimental situation in which neither party assumed the particular risk, (b) a great concern on the part of the Government with the process (and not merely the end product), and (c) a distinct benefit to the Government from the contractor's prolonged period of trial-and-error.

---

1. Including the significant elements that (1) bidders were allowed to bid on a spectrum of quantities and to set a different price for each range of quantities on which a bid was proffered; (2) at least for the smaller quantities the pierce-be-

fore-forming method was admittedly practical; and (3) the Board found, on substantial evidence, that the drawing did not *require* use of that method but merely allowed it.