**FOSTER WHEELER CORPORATION**

v.

**The UNITED STATES.**

No. 371–72.

United States Court of Claims.

March 19, 1975.

Eugene Schaffel, New York City, atty. of record, for plaintiff. Thomas W. Moore, III, Jarvis, Pilz, Buckley & Treacy, New York City, of counsel.

Raymond B. Benzinger, Washington, D. C., with whom was Asst. Atty. Gen. Carla A. Hills, for defendant.

Before DAVIS, KASHIWA and KUNZIG, Judges.

PER CURIAM:

This case comes before the court on defendant's request, filed August 26, 1974, for review by the court of the recommended decision, filed June 5, 1974, by Trial Judge Charlotte P. Murphy, pursuant to Rule 166(c) on plaintiff's motion for summary judgment under Rule 163(b) and defendant's cross-motion for summary judgment. The case has been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, it is concluded that plaintiff is entitled to recover and plaintiff's motion for summary judgment is granted and defendant's cross-motion is denied. The case is remanded to the Armed Services Board of Contract Appeals pursuant to Rules 149 and 150 of this court for determination of the amount of plaintiff's recovery with plaintiff's attorney directed to give advice by letter to the trial judge of the status of the remand proceedings at intervals of 90 days or less from the date of this opinion.

OPINION OF TRIAL JUDGE

MURPHY, Trial Judge: Plaintiff, Foster Wheeler Corporation (FWC), seeks by motion for summary judgment[1] to nullify an adverse decision by the Armed Services Board of Contract Appeals[2] denying plaintiff an equitable adjustment for costs incurred in attempting to comply with allegedly impossible contract obligations. By agreement of the parties, the issue before the Board was lim-

---

1. Pursuant to the Wunderlich Act, 41 U.S.C. §§ 321, 322. Plaintiff's petition to the court also stated an alternative claim for breach of contract. Plaintiff agreed to hold this alternative claim in abeyance and proceed upon it only if unsuccessful in the present action. In view of the result reached herein, the claim for breach need not be considered.

2. Foster Wheeler Corporation, ASBCA No. 13721, 72–2 BCA ¶ 9484.

ited to liability; hence a decision favorable to plaintiff, as reached herein, requires that the Board conduct a second proceeding to determine the amount of plaintiff's recovery.

On February 21, 1966, defendant, acting through the Philadelphia Naval Shipyard, awarded to FWC a fixed-price, supply contract[3] for marine equipment and related written materials. Insofar as is relevant to the present dispute, plaintiff bound itself to design, fabricate, and deliver within 13 months[4] two "main boilers," referred to as AGC–19 boilers, and to perform a "dynamic shock analysis" study which would demonstrate that the AGC–19 boilers would withstand shock to intensities (G-forces) prescribed in the contract specifications. The contract price for the boilers was $271,970.00, and for the dynamic shock analysis, $8,500.00.

"Dynamic shock analysis" or the "dynamic design-analysis method" (DDAM) was developed in an effort to decrease the vulnerability of Naval ships to effects of shock. DDAM involves the creation of a mathematical model to represent a piece of equipment, use of dynamic inputs which substitute for physical stresses, and failure criteria. DDAM is thus a computer simulation intended to predict the shock-hardness of the particular piece of equipment.

Many of the events of the contract performance period must necessarily be reviewed in detail to convey the circumstances which impelled plaintiff to request an equitable adjustment from the contracting officer, and ultimately to seek relief in this court.

For the reasons set out hereafter, we conclude that the AGC–19 contract was impossible to perform, that the Government must bear the risk of impossibility, and that plaintiff has not waived its

claim. Consequently, plaintiff is entitled to recover an equitable adjustment, pursuant to the changes clause, of costs incurred in attempting to meet faulty specifications.

I

The following are the background facts from which the legal issues arise. They are as found by the Board or are otherwise undisputed.

After the contract was awarded in February 1966, plaintiff submitted preliminary design plans on March 4 and May 19, and performed in-house tests of its preliminary design plan on August 12. As a result of these tests, plaintiff realized that substantial modification of its existing, nonshock-hard boiler design was imperative if shock-hardness was to be achieved. Plaintiff requested, on October 3, an extension of the delivery date from March 21 to June 30, 1967. This was the first of many time extension requests by plaintiff, to which the Government invariably consented, either expressly or by conduct.[5]

Plaintiff submitted a proposed mathematical model on November 1, 1966. A conference was held on January 6, 1967, to air the Government's criticisms and suggestions pertaining to the model. More importantly, at the meeting plaintiff outlined proposed changes in boiler design which plaintiff felt necessary to meet the shock-hard requirements. In a follow-up letter of January 11, 1967, plaintiff described in some detail the design changes which it felt essential to relieve the overstressed areas. In the letter, and in the meetings and correspondence throughout the first 9 months of 1967, there was continual reference to apparent conflicts between the shock specifications on the one hand,[6] and re-

---

3. Contract No. N00151–23972A(X).

4. The invitation for bids stated that delivery was required within 15 months and desired within 13 months. Plaintiff agreed to deliver the boilers within 13 months.

5. Plaintiff's entitlement to extensions of the delivery date is not an issue herein. The

Government did not argue that failure to meet the original delivery date constituted a breach by plaintiff, nor could it in view of its acquiescence in the extensions.

6. Shock specifications were contained in Appendices A and B to the contract.

quirements of maintenance, repair, and accessibility on the other.[7] Meetings of February 9, April 4, and June 29 provided forums for discussion of the conflicts, but the Government balked at approving plaintiff's recommended design modifications because, as plaintiff had indicated, they would have restricted accessibility to the boiler components for repair and replacement. FWC maintained, however, that unless the Government compromised either its shock-hardness or maintenance requirements, the contract specifications could not be met.

As a result of a September 27, 1967 letter from Gibbs & Cox, the Government's Design Agent,[8] to the Navy, which letter emphasized that significant parts of FWC's boiler remained overstressed, an October 4, 1967 conference was held. At that conference, the Government agreed to accept plaintiff's boiler design as then conceived and to permit the dynamic analysis of that design to be completed concurrently. FWC was to recommend methods for reduction of stresses due to shock loading for "future generation" boilers. The agreement thus entailed two concessions by the Government: approval of a nonshock-hard design, and a release for fabrication of the boilers prior to completion and approval of the DDAM item.

The Government's concessions followed efforts by the plaintiff far in excess of what the latter had anticipated in taking on the project. In its proposal in response to the Government's bid invitation, plaintiff summarized its anticipated DDAM study of the AGC–19 boiler in the following manner:

Determine three shock models and sets of spring constants. Run models on computer including *one rerun after first round of design modification.* Interpret results in terms of shock stresses, combining with pressure stresses in some instances. Recommend practical improvements in the boiler. Perform vibration analysis on longest tubes and steam drum internals. Write report. [Emphasis supplied.]

The summary indicates that plaintiff had planned to create three models or representations (each involving different assumptions) of an actual, existing boiler design, and then to perform a dynamic analysis on each model. The results of the dynamic analyses were expected to provide insight as to design modifications necessary to render the boilers shock-hard. Once the modifications had been made, plaintiff would repeat the computer analysis once more.

As it happened, however, by the time of the October 4 conference, plaintiff had already revised its mathematical model three times and conducted multiple dynamic analyses of these models. Yet there was no indication that plaintiff was substantially closer to creation of a shock-hard boiler than it had been in January of that year.

Plaintiff submitted its intended final mathematical model and DDAM report on December 19, 1967. The Government, however, by letter of April 15, 1968, informed FWC that further work was to be done. This demand represented a substantial change in the Government's position as established by the October 4, 1967 agreement. The status of Government concessions under the agreement, what the Government had in fact con-

---

7. MIL–B–18381B (SHIPS) Requirement 3.2 stated (in part):

" * * * Reliability in service and accessibility of all parts for repair, replacement, and cleaning by ship's forces shall be paramount. * * * "

MIL–B–18381B (SHIPS) Requirement 3.7.4 prescribed:

"3.7.4 All generating tubes between the superheater and economizer shall be removable and replaceable without cutting of any structural members. All generating tubes except screen and furnace wall tubes shall be remova-

ble and replaceable from the side of the boiler without removing the superheater tubes. Screen, rear and side wall tubes shall be removable and replaceable through boiler access openings without the necessity of cutting boiler casings."

8. As Design Agent, Gibbs & Cox acted as agent for the Government in evaluating and critizing FWC's DDAM work, and in making recommendations to the Government. Actions of Gibbs & Cox are treated herein as actions of the Government.

ceded by that agreement, and what the Government still expected plaintiff to be able to accomplish was thus rendered unclear.

It was at this point, specifically May 17, 1968, that plaintiff wrote to the contracting officer to request an equitable adjustment in the amount of $192,481.11. The letter was not couched in specific terms of "impossibility," nor did it speak of any specific change for which an equitable adjustment was claimed under the "Changes" clause [9] of the contract. Rather FWC characterized its claim as follows:

> * * * [T]he contract, though issued as a fixed price supply type order, became developmental, and contained the indefinite characteristics usually associated with research orders of a "cost plus" type. The result was that the Government fostered this activity and received the benefit of the development work for this contract, and for future application.
>
> The presence of this developmental factor, in a fixed price contract, with its change potential on design specification, should permit the contract to be extended on delivery and to be open to cost renegotiation, and possibly open to dispute.
>
> The impact of the Dynamic "Shock" requirements has resulted in a hardship, extending delivery beyond contractual dates, and increasing the cost of performance by Foster Wheeler Corporation in the amount of $192,481.00 detailed in Attachment "B".

The contracting officer's denial of plaintiff's claim asserted that all costs were incurred in attempting to meet the original specifications, and thus there was no "change" for which compensation would be awarded.

## II

Plaintiff's complaint, filed on appeal to the Armed Services Board of Contract Appeals (the Board), specifically requested an equitable adjustment, based on the "Changes" clause, in the amount of $192,481.00. The claim alleged impossibility of performance due to the conflict in specifications, and, in addition, alleged Government delays and inconsistencies which increased the costs of performance. Plaintiff's pre- and post-hearing briefs, however, specified impossibility of performance as the sole basis of plaintiff's claim. Plaintiff indicated during the hearing that it would seek more than the $192,481.00 originally claimed, if it was found entitled to an equitable adjustment; however, the hearing dealt only with the issue of liability, so that proof of costs was not taken.

The Board [10] misinterpreted plaintiff's claim, believing it to be based on dual theories of recovery, rather than on the single theory of impossibility.[11] Thus the Board first denied recovery based on a claim it erroneously attributed to FWC—namely that:

> * * * [A]ppellant's 11 January 1967 design revision proposal and its substantial acceptance at the 4 October 1967 conference constituted a compensable major change in contract requirements. [72–2 BCA at 44,183.]

As has been stated, plaintiff is *not* claiming that new specifications increased costs of performance and hence constituted a "Change" for which an equitable adjustment should have been awarded. Instead, plaintiff claims that it should recover costs incurred in an attempt to

---

9. The contract contained the standard "Changes" clause (Standard Form 32; June 1964 edition) which specified in part:

"* * * If any such change causes an increase or decrease in the cost of, or the time required for, the performance of any part of the work under this contract, whether changed or not changed by any such order, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. * * * "

10. See n. 2, *supra*.

11. The vagueness of plaintiff's original claim to the contracting officer, as described earlier, makes the Board's confusion understandable. However, this vagueness was cured by the clarified claim subsequently filed with the Board.

perform the *original*, impossible specification. The latter, plaintiff's actual claim, was labeled by the Board as plaintiff's "alternative claim basis." Regardless of the label used, the Board clearly denied recovery:

> We have reviewed and considered all of the evidence of record concerning the alternative claim approach described above. We conclude that it does not establish the alleged general impossibility of performing the subject contract. * * * And it does not negate respondent's affirmative defense based on the contractor's general assumption of contractual responsibility and risk. [72–2 BCA at 44,185.]

The Board did, however, find plaintiff entitled to equitable adjustments for three specific matters which it classified as "out of scope work." In the first, the Board found the Government liable for costs, to be determined in later proceedings, of a particular conflict between the shock and the maintenance and replacement requirements: the need, for shock-hardness purposes, of "tiebacks" connecting the boiler casing and sidewall, rearwall, and roof tubes.[12]

The second "out of scope" project was said to be a study of weld reinforcement which the Government ordered plaintiff to do by use of an advanced technique. The technique, the Board found, was outside the scope of the contract, and as a result, the costs were recoverable.

The third and final equitable adjustment granted by the Board was for design engineering costs "incurred after its [plaintiff's] submittal letter dated 29 May 1968 and until its final revision submittal on 10 January 1969." 72–2 BCA

at 44,189. It was explained above that the Government had agreed on October 4, 1967 to accept plaintiff's then-existing nonshock-hard boiler design, but that the Government reneged on the agreement when, on April 15, 1968, it required further analysis. Plaintiff, as the Board noted, did the additional work under protest, submitting yet another "final report" on January 10, 1969. The Government then delayed final acceptance until April 15, 1969.[13]

### III

Plaintiff's motion for summary judgment found fault with 17 factual statements in the Board's decision, and, in addition, disputed the particular findings that the contract was not impossible to perform, and that plaintiff assumed the risk of impossibility. Some of the contested factual findings are not relevant to the issues of impossibility of performance and assumption of risk; the literal accuracy of others is not disputed by plaintiff, which rather addresses itself to its perceptions of their misleading implications. Thus, the contested findings are discussed only if they have an impact upon relevant matters.

### IV

### *Impossibility of Performance*

The Board's finding that performance of the contract was not impossible was a conclusion of mixed fact and law. *Ray D. Bolander Co. v. United States*, 186 Ct.Cl. 398, 405 (1968); *United Contractors v. United States*, 368 F.2d 585, 596 n. 5, 177 Ct.Cl. 151, 162 n. 5 (1966). To the extent that the finding was based on matters of fact, it is enti-

---

12. It can only be inferred from the Board's opinion that it saw some distinction between the conflict regarding "tiebacks," on the one hand, and the other areas in which FWC's proposed solutions to meet shock-hardness conflicted with the maintenance specifications, on the other. As our nullification of the Board decision implies, the court is unable to perceive any distinguishing feature of the former. Furthermore, the allowance of the "tieback" costs is inconsistent with the Board's finding that plaintiff had assumed the risk of impossibility.

13. From the three specific equitable adjustments granted by the Board, one can infer that the Board found some degree of merit in plaintiff's claim for an equitable adjustment. Since the basis for recovery as stated by the Board has an internal inconsistency (see n. 12, *supra*), and because the court's decision, *infra*, agrees with plaintiff that there is a broader basis for recovery, we reject the Board's analysis. Nevertheless, it may prove that the bulk of plaintiff's eventual recovery in light of this decision consists of the costs of the work described by the Board as "out of scope."

tled to finality in this court, under the Wunderlich Act, *supra*, if supported by substantial evidence. The Supreme Court has described substantial evidence as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. This test requires consideration of the whole record, including both favorable and unfavorable evidence. Universal Camera Corp. v. NLRB, 340 U.S. 474, 477–484, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). See also Tecon Corp. v. United States, 411 F.2d 1271, 1280, 188 Ct.Cl. 436, 451 (1969); T. C. Bateson Constr. Co. v. United States, 149 Ct.Cl. 514, 518 (1960).

■ To the extent that the Board's decision was one of law, this court is, of course, free to arrive at its own conclusions. Tombigbee Constructors v. United States, 420 F.2d 1037, 1050, 190 Ct.Cl. 615, 638 (1970). The legal use of the term "impossibility" has long included more than *absolute* impossibility. We, as well as other federal courts, have followed the definition found in Restatement of the Law, Contracts § 454:

> * * * [I]mpossibility means not only strict impossibility but impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved.

See Natus Corp. v. United States, 371 F.2d 450, 456, 178 Ct.Cl. 1, 9 (1967); United States v. Wegematic Corp., 360 F.2d 674, 676 (2d Cir. 1966); Transatlantic Financing Corp. v. United States, 124 U.S.App.D.C. 183, 363 F.2d 312, 315 (1966). If a contractor proves "impracti-

cability," *i. e.*, "commercial impossibility," of a contract, it is entitled to recover its costs of attempting to perform the contract, provided that the contractor did not assume the risk of impossibility. *Tombigbee Constructors, supra;* [14] Stock & Grove, Inc. v. United States, 493 F.2d 629, 643, 204 Ct.Cl. 103, 130 (1974). Of course, if the contract specifications are *absolutely* impossible (in the sense of requiring performance beyond the state of the art), then, with the same proviso, the contractor is entitled to recover its costs. Such recovery may be had pursuant to the standard "Changes" clause of the contract. Hol-Gar Manufacturing Corp. v. United States, 360 F.2d 634, 175 Ct.Cl. 518 (1966).

■ Plaintiff asserts that the design of a boiler to be shock-hard by means of dynamic shock analysis is both commercially and absolutely impossible. We hold that the Board's decision to the contrary was not supported by substantial evidence and was incorrect as a matter of law. The factual evidence which we find compelling is outlined below.

A. The Government ultimately accepted plaintiff's boiler design, although it knew the boiler was not shock-hard.

There can be no dispute that the Government retreated from its requirement that the AGC–19 boilers be shock-hard. In its letter of January 11, 1967, FWC described several areas which were overstressed, and proposed modifications of design which, in some cases, admittedly violated accessibility and maintenance specifications, but were considered necessary to satisfy shock specifications.[15]

14. In *Tombigbee*, the contractor was required to achieve "95% compaction" of earth. Although 95 percent compaction was achieved on the first half of the job, it was achieved only "with difficulty and great cost, with the use of a variety of equipment and without possibility of meeting the construction schedule." 420 F.2d at 1049, 190 Ct.Cl. at 636. The Government by change order alleviated the problem for the second half of the work. The Board, whose decision was upheld by this court, granted the contractor its costs of attempting the commercially impossible task of achieving 95 percent compaction of earth within the time and monetary boundaries of the contract.

15. The minutes of a meeting on September 22, 1966 revealed that as early as that date, plaintiff indicated that its nonshock-hard design would not be adequate to meet the contract shock requirements. Even though plaintiff and the Government thereafter attempted to work out these conflicts, in a letter of September 27, 1967 from the Government's Design Agent, Gibbs & Cox, to the Supervisor of Shipbuilding, it was noted that significant overstressed areas remained.

The majority of these areas of overstress remained unrelieved throughout the contract period. The Government agreed at the October 4, 1967 conference (6 months after the original delivery date) to accept the boiler with these overstressed areas, and any doubt that the Government knew it was approving a *nonshock-hard* boiler is dispelled by FWC's letters of December 19, 1967 and January 10, 1969, which were explicit on the subject.

The only Board finding of fact which might be relevant to this matter is the statement [16] that, to the extent the October 4, 1967 design release was an "arguable relaxation of the general requirement for shock-hard design," it was "bargained and generally settled by accommodation." This finding is of doubtful relevance because it was made in conjunction with the nonclaim attributed by the Board to FWC that there was an actual "change" in specifications. Nevertheless, to the extent that the finding may suggest that the October 4, 1967 agreement was an "accord and satisfaction" as to plaintiff's costs, the evidence does not bear this out. Minutes of the conference reveal no discussion of costs; plaintiff simply urged at the meeting that the shock-hard requirements be dropped, and defendant agreed to do so. There is no basis for inferring any additional agreement.

### B. No other boiler manufacturer succeeded in designing a shock-hard boiler.

Defendant's own witness, Mr. George Caley, admitted in cross-examination that other boiler manufacturers had similar problems as FWC's with shock-hard requirements, and *all* of them received waivers. Defense counsel stipulated that a major competitor of FWC, Combustion Engineering, had produced a boiler with several overstressed areas which the Government waived. The Board made

no comment about these common experiences.

That no other boiler manufacturer succeeded where plaintiff failed is probative of the conclusion that FWC's failure to achieve a shock-hard boiler was not the result of incompetence of its technicians or engineers.[17] It also suggests strongly that the alternative explanation, impossibility, is the correct one.

### C. The Government has changed its specifications relating to shock-hardness.

The Government changed its policy by directive of May 31, 1968, so that marine equipment manufacturers would not be required to build nontestable components to be shock-hard under dynamic analysis, except *at Government expense* and *risk:*

(1) For all non-testable components, the Navy will specify *static* design values (g levels) for equipment design. The contractor will be required to meet these levels. Design values will be based on previous analyses, test data where available, and recommendations from the appropriate technical interests.

(2) For non-testable components designed by g levels and static methods, the contractor will be required to perform a *concurrent dynamic analysis* and to complete the analysis prior to shipment of equipment. Items found deficient by the analysis shall be identified to the Navy by the contractor with proposed corrective action. All design changes associated with the difference between the specified static design values and the dynamic analysis will be incorporated into equipments *at the option and expense \* \* \* of the Navy.* Such design changes will be accomplished only when authorized by change order. [Emphasis supplied.]

---

16. 72–2 BCA at 44,183.

17. The Board did not find otherwise, but defendant's counsel did argue the possibility in its written submissions to the court. Plaintiff's witnesses uniformly stated that FWC did

its work competently and the Government's Design Agent in its letter of July 3, 1968 indicates that plaintiff did everything reasonably within its power to produce a shock-hard boiler.

The shift in policy marks a retreat from the burden placed upon plaintiff to design a dynamically shock-hard boiler. The policy change may not in itself represent an admission of impossibility by the Government, but clearly the Government viewed its previous requirements as inadvisable.

### D. The Muster Committee Report supports an inference of impossibility.

In April 1967, an "Ad-Hoc Committee" was commissioned by the Naval Ship Systems Command Headquarters to study "the suitability and practicability of the dynamic analysis method as a means of satisfying shock design requirements of new construction programs." The Committee, usually referred to as the Muster Committee, consisted of three representatives each from the Government shipbuilding, private aerospace, and academic communities. In its report of October 24, 1967, the Committee made comments and arrived at conclusions which are pertinent to the AGC–19 contract.

It will be recalled that plaintiff's contract specified delivery of the AGC–19 boilers within 13 months. This meant that plaintiff was to create a mathematical model, have it approved, carry out a DDAM study, have that approved, and then fabricate the boiler, all within the 13-month period. The 13-month schedule should be compared to the following excerpt from the Muster Committee Report at 39–40:

> Navships Instruction 9400.13 or a similar set of rules and guidelines is needed in dynamic design analysis; however, the *Instruction requirements are incompatible with shipbuilding contracts from a time standpoint.* In the Ship "C" specifications it is required that the model report be approved prior to the design analysis and the design analysis report must be submitted for approval two months

prior to procurement release for fabrication. For this contract, SupShips 3 estimates that from *40 to 94 weeks may be required to complete the preparation, review, and approval cycle of the model and analysis reports.* Experience to date shows that this estimate is not unrealistic. *A portion of the design time for equipment must be added to the 40 to 94 weeks required for dynamic analysis approval in establishing equipment lead time.*

> Long lead-time items, such as shafting, shaft bearings, boilers, propulsion turbines, reduction gears, steering gear, SSTG sets, condensers, and DFT's require a release for manufacture for certain portions within a few months after the shipbuilding contract is awarded. *If 40 to 94 weeks, plus the detail design time, must elapse prior to work release, it is obvious that present ship delivery schedules cannot be met.*

> As it is now written, Navships Instruction 9400.13 does not resolve the basic incompatibility between ship contract construction schedules and the requirement for dynamic design analysis for shock-hardening ships.[18] [Emphasis supplied.]

Undisputed testimony of plaintiff's engineer reveals that the actual fabrication of the boiler requires approximately 8 months. The minimum time required to build a shock-hard boiler, if possible at all, would thus be 40 to 94 weeks, *plus* detail design time, *plus* 8 months for fabrication.

The excerpt from the Muster Committee Report is confirmed by testimony of plaintiff's witness who demonstrated convincingly that, even if the DDAM work were approved on the first submission—an unlikely possibility—a minimum of 19 months would be needed to perform the contract.[19] More likely, the witness stated, several cycles of design,

---

**18.** By letter of August 29, 1966 from the Government's Design Agent, Gibbs & Cox, Navships Instruction 9400.13, dated June 30, 1966, was called to plaintiff's attention.

**19.** Mr. Eric M. Perryman, engineer and FWC contract manager.

analysis, and approval would be required over an *indefinite* time period and at *unlimited* cost. Defendant's witness, Mr. Richardson of Gibbs & Cox, agreed that plaintiff's time calculations were reasonable.

The Muster Committee Report characterized "the introduction of DDAM as a general contractual requirement" as "relatively abrupt and premature." The Committee's conclusions include those which follow:

> 7.  neither the Navy nor industry has provided adequate organization and management for effective prosecution of the dynamic analysis shock design program.
>
> \*   \*   \*   \*   \*   \*
>
> 8.  the current specification requirements for completion of analyses prior to release for manufacture are unrealistic and unsatisfactory.
>
> \*   \*   \*   \*   \*   \*
>
> 9.  Many equipment suppliers and shipbuilders are convinced that they have been expected to assume unreasonable business risks.
>
> \*   \*   \*   \*   \*   \*
>
> 10. there is a need for improved organization and management of the review and approval process.

### E.  Expert testimony weighed heavily in plaintiff's favor.

Plaintiff's two expert witnesses, Dr. Norman Abramson and Dr. Wilfred Baker, were employed by the Southwest Research Institute, a nonprofit organization which had consulted with FWC on the AGC–19 boiler. They testified that DDAM was and is evolutionary and developmental in nature, that the attempt to create a shock-hard boiler was beyond the state of the art in 1966, or even at the time of the Board hearing, and that plaintiff's work was competent.

Defendant's witnesses were not always in agreement with one another. Mr. John Richardson not only found plaintiff's time calculations to be reasonable,

but also voiced his agreement with the Muster Committee conclusions. While he testified that FWC's mathematical work was at times simplistic and inaccurate, a portion of a letter written by him to the Supervisor of Shipbuilding on July 3, 1968, suggests that the real problem did not lie with plaintiff:

> In view of the unsymmetrical and extremely complex structure, as well as the presence of many non-linear and non-elastic elements representing the boiler and *the many assumptions which are required to be made in attempting to model and simulate the response of the boiler under shock, the validity of the result of the dynamic analysis of a boiler is highly questionable.* Therefore, the Design Agent has serious doubts as to whether the results of the analysis are sufficiently reliable to justify making any additional changes in the boiler design. It is also questioned as to whether further analyses as requested in Reference (a) are justifiable. [Emphasis supplied.]

Other defense witnesses testified about the value and utility of DDAM as applied to a boiler. They suggested that the Muster Committee Report contained some factual inaccuracies. When pressed on cross-examination, however, the witnesses were unable to challenge effectively plaintiff's claims that the contract, if possible to perform at all, could not be performed within 13 or 15 months, and that no other boiler manufacturer had succeeded where plaintiff failed. In addition, their isolated criticisms of the Muster Committee Report did not, in our view, lessen the significance of the Report's conclusions. The significance of the Report was not lost on the Government either, for a defense witness testified that it was the Muster Committee Report which led the Government to lessen the burden placed on future contractors with respect to shock-hardness (see discussion of this policy change beginning at D above).

All of the foregoing clearly prompts the conclusion that the building of a

shock-hard boiler was shown to be beyond the state of the art. While the expert evidence preponderates heavily in plaintiff's favor, the convincing evidence is that neither FWC nor any other boiler manufacturer has succeeded in building a shock-hard boiler, and that the Government has retreated in its requirements as a result of the Muster Committee Report.

Plaintiff's evidence was also directed toward a showing of "commercial" impossibility. Under this theory, it is contended that the construction of a shock-hard boiler, even if ultimately possible, could not be accomplished without commercially unacceptable costs and time input far beyond that contemplated in the contract. To design a shock-hard boiler by means of a mathematical model and dynamic analysis could, said plaintiff's witness, Mr. Perryman, take an infinite amount of time. The preparation of the model, with review and rework followed by the dynamic analysis and its review and rework, would require 16 months, *assuming* results were consistent with the performance requirements of the boiler. With 8 months added for fabrication, the minimum time in which the contract could be performed would be 24 months. If it happened that the shock-hardness qualities of the boiler conflicted with performance requirements, there would be need for a design compromise which would begin the entire cycle over again.

Even if no rework and no new cycle proved necessary—an extremely unlikely possibility—a minimum of 19 months would be necessary to perform the contract. The commercial impossibility of performing the contract is supported by plaintiff's experts and also by the Muster Committee Report, as quoted above.

The evidence shows, therefore, that the AGC–19 contract contained specifications which were impossible to meet, either commercially or within the state of the art.

## V

*Assumption of the Risk of Impossibility*

■ The Board found[20] that FWC generally assumed "contractual responsibility and risk" of impossibility. Assumption of risk, like impossibility, is a mixed question of fact and law, fact as to the statements and actions of the parties, but law as to the significance of these statements and actions, particularly the interpretation of contract language.

■ There is no dearth of precedent on the subject of assumption of risk of impossibility. Two factual questions have emerged from these earlier cases to be determinative of the legal issue: (1) which party had the greater expertise in the subject matter of the contract? and (2) which party took the initiative in drawing up specifications and promoting a particular method or design?

■ As to question one, the evidence establishes that while DDAM was, as a concept, not new at the inception of the AGC–19 contract, application of this concept in an attempt to achieve an entire, shock-hard boiler was a "first" for plaintiff (and, it appears for anyone). FWC's only prior contractual experience in the use of DDAM to test a boiler was limited to the foundation parts of boilers only, and at lower G-force requirements. The testimony and events demonstrate convincingly that the difficulties in use of DDAM increase enormously with the complexity of the structure which is to be designed shock-hard. That a boiler is such a complex structure may be garnered from the July 3, 1968 letter of the Government's Design Agent, quoted in relevant part *supra*, and from the following excerpt from the Muster Committee Report:

The boilers present particularly difficult problems which it is necessary to design by presently specified dynamic analysis procedures. The boiler contains a great number of tubes which vary in size, shape, and length. Some

20. 72–2 BCA at 44,185.

of the tubes are cantilevered and many have long unsupported sections. Although the long flexible tubes are ideal considering the thermal expansion associated with normal boiler operation, these low frequency systems are subject to high calculated stresses under shock.

The Government's expertise in the application of DDAM to marine equipment at least equalled, and probably surpassed, plaintiff's. The leading study on DDAM in this area was done by Government employees (the Government's expert witnesses at the hearing), Robert O. Belsheim and George J. O'Hara. Published in May 1961, the Belsheim & O'Hara study was entitled "Shock Design of Shipboard Equipment, Part 1— Dynamic Design-Analysis Method." The study was listed in the invitation for bids as a guide to contractors in performing the contract. Plaintiff's proposal to the Government included the statement below:

> Foster Wheeler will use the specified Belsheim & O'Hara surface ship inputs in the shock analysis. These are included in our dynamic shock computer program.

Testimony of plaintiff's witnesses confirmed the fact that plaintiff was relying on the Belsheim & O'Hara study throughout the contract period. Furthermore, the Government's witness, Mr. Richardson, the head of Gibbs & Cox's scientific division, testified that, although FWC had the expertise in design and fabrication of boilers, the Government knew more about DDAM than plaintiff.

Notwithstanding the above, plaintiff was not entirely a novice in the application of DDAM to boilers. During 1965, the year prior to the award of the AGC–19 contract, plaintiff carried out an in-house study of DDAM as applied to a somewhat different boiler design. The study was not done for any particular contract, but as general preparation for future contracts, such as the one in issue, which plaintiff knew would involve DDAM. From this study, plaintiff could surmise that its *non*shock-hard boiler design would not satisfy shock-hard requirements without some amount of modification.

In summary, plaintiff had some limited experience in the application of DDAM to boilers, but it was *not* the "expert" of the two parties, either in fact, or in the Government's perception.

Relative to the second question (which party took the initiative in drawing up specifications and promoting a particular method or design?), the invitation for bids, sent to plaintiff, included extremely detailed performance specifications, the great majority of which were prescribed by the Government. Those not specified by the Government were to be filled in by FWC and included in its bid. In addition, the Government specified "limiting dimensions" of the boiler, some internal dimensions, and very few design specifications. There was a detailed list of equipment which the boilers were to include. Design was restricted by requirements of access to the various components for inspection and maintenance.

In addition to the specifications described above, Appendices A and B to the contract contained the shock-hardness specifications which FWC was required to meet. The invitation listed a desired delivery in 13 months, and a maximum delivery date of 15 months. Plaintiff agreed to a 13-month period in its bid.

Finally, the invitation required that the contractor's bid include the following:

> * * * a detailed statement concerning the design procedures contemplated, setting forth the points of interest for stress and deflection checking, a rough mathematical model and the number of iterations anticipated for a successful design. The Seller's proposal shall also include a statement as to Seller's past experience with respect to preparation of mathematical models and dynamic shock analysis, and whether this work will be performed by the Seller's own staff or an outside consultant.

On November 22, 1965, plaintiff wrote to the Government officials to describe its qualifications, experience, and suggested solution, as required by the contract. Also, a meeting was held that day to discuss the 1965 in-house DDAM study carried out by FWC on another boiler. The contract was awarded February 21, 1966.

After reciting substantially the above facts,[21] the Board made the following conclusory statement: [22]

> Evidence for appellant shows that when it bid for and received this contract for dynamically-designed, high-strength boilers for the AGC–19 and for design strength tests, its engineering staff was aware of the implications of the dynamic design requirements and the specified dynamic shock analysis test procedures. * * * The contract award shows that the Government was persuaded by appellant's demonstration that it had the experience, competence and qualifications to perform the specified work.

The vagueness of the statement is such as to make very difficult the ascertainment of its intended significance. FWC was said to be "aware of the implications" of DDAM, but we are not told what "implications" the Board had in mind. There is no reason to believe that either party was aware that the contract would prove impossible to perform, nor that the task would be so very formidable.[23]

The Board states also that the Government was "persuaded" by plaintiff that the latter could do the job. Plaintiff surely attempted to convince the Government that its qualifications were as good or better than those of its competitors, but the contract *required* that the Government be persuaded to award the contract to plaintiff on the basis of its experience, qualifications, and recommendations. The fact that plaintiff's bid was the lowest of the three received was undoubtedly another persuasive factor.

■ The risk that contract specifications will prove impossible to meet may lie with the Government, the contractor, or both (in the case of mutual mistake of fact).

The leading case in this court in which risk of impossibility is imposed on the Government is *Hol-Gar Mfg. Corp., supra.* There, the Air Force issued a Request for Proposals for the manufacture of 107 electric generator sets which would meet the Government's elaborate performance specifications. Contractors were to submit a Technical Proposal consisting of analyses of proposed methods of compliance, anticipated problems, and solutions to the problems. A bidder's conference was held, and technical details of the specifications were reviewed. Plaintiff subsequently submitted its proposal, which, in accordance with the Government's requirement, suggested the type of engine which it believed would meet the specifications. The contract called for delivery of design data within 70 days, followed by manufacture.

The contractor eventually concluded that the engine it was adapting could not meet the specifications and suggested the relaxation of size and weight limitations such that another type of engine could be used. Defendant agreed to do so. The contractor then claimed its costs of attempting to meet the original speci-

---

**21.** 72–2 BCA at 44,177–178.

**22.** 72–2 BCA at 44,178.

**23.** The contract period, 13 months, was the usual period for design and fabrication of a nonshock-hard boiler. The relative amounts to be spent on the fabrication of the boiler and the DDAM work—$271,970 and $8,500, respectively—suggest that complications in DDAM work were not anticipated (compare to FWC's May 17, 1968, claim for an equitable adjustment, wherein $139,593 of costs were claimed for the DDAM portion of the work). Testimony of *both* Government and FWC witnesses reveals that neither party believed that substantial modification of FWC's *nonshock-hard design would be required. Finally, the use of a *fixed-price supply* contract is also indicative of the parties' intentions and expectations. See *Johnson Electronics, Inc.*, ASBCA No. 9366, 65–1 BCA ¶ 4628 (1964).

fications. In awarding these costs, this court stated (360 F.2d at p. 638, 175 Ct.Cl. at p. 524):

That changes in the specifications were required is clear from the fact that after numerous negotiation sessions, during which time the plaintiff was attempting unsuccessfully to comply with the specifications, they were changed by the execution of Supplemental Agreement No. 8. We are of opinion that this "change cause[d] an increase * * * in the cost of * * * performance of this contract," because the change in specifications made useless some of the expenditures plaintiff had made up to that point, but plaintiff was nevertheless out of pocket this money and it must be included in its cost of performance. Since the necessity for the change was not due to plaintiff's fault, but to faulty specifications, an equitable adjustment requires that plaintiff be paid the increase in its costs over what they would have been had no change been required.

The Armed Services Board of Contract Appeals has recognized the correctness of the allowance of costs incident to an attempt to comply with defective specifications. See, e. g., J. W. Hurst & Son Awnings, Inc., 59–1 BCA ¶ 2095 at 8965 (1959), where the Board stated:

* * * Where, as here, the change is necessitated by defective specifications and drawings, the equitable adjustment to which a contractor is entitled must, if it is to be equitable, i. e., fair and just, include the costs which it incurred in attempting to perform in accordance with the defective specifications and drawings. Under these circumstances the equitable adjustment may not be limited to costs incurred

subsequent to the issuance of the change orders. [Citations omitted.]

The similarities between *Hol-Gar Mfg. Corp., supra,* and the instant case are striking and compelling. Both cases involve (1) a fixed-price, supply contract, (2) detailed performance specifications drawn up by the Government, (3) a requirement that the contractor submit a Technical Proposal, (4) meetings of the parties when the contractor's difficulties became apparent, and (5) an eventual relaxation of specifications by the Government so that the contractor would be able to complete the contract. The *Hol-Gar* decision was expressly followed in Maxwell Dynamometer Co. v. United States, 386 F.2d 855, 181 Ct.Cl. 607 (1967), and we follow it here.

Defendant asserts that the instant case falls within that line of cases in which the *contractor* was deemed to have assumed the risk of impossibility. *See e. g.,* J. A. Maurer, Inc. v. United States, 485 F.2d 588, 202 Ct.Cl. 813 (1973); Bethlehem Corp. v. United States, 462 F.2d 1400, 199 Ct.Cl. 247 (1972); Austin Co. v. United States, 314 F.2d 518, 161 Ct.Cl. 76, cert. denied, 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62 (1963). These cases, however, have the common elements, not present in the instant case, that the contractor in each had expertise superior to the Government's, and that in some manner the initiative was wrested by the contractor from the Government's hands.[24]

The factual circumstances here are likewise not amenable to a finding of mutual mistake of fact. The chief consideration which led the court to find mutual mistake in National Presto Industries, Inc. v. United States, 338 F.2d 99, 167 Ct.Cl. 749 (1964), cert. denied, 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965), was a "mutual agreement" of the parties prior to award of the contract, such that the court viewed the project as

---

**24.** In *J. A. Maurer, Inc., supra,* the contractor assured the Government officials that it had the special expertise to perform, by its own *technique,* a very experimental task which it knew had never been accomplished previously.

In both *Bethlehem Corp., supra,* and *Austin Co., supra,* the contractor actually substituted one or more specifications for the Government's and then assured the Government that it could perform the contract as modified.

a "joint enterprise." [25] That case did *not* involve a claim of impossibility of performance. In any contract in which the specifications turn out to be impossible to perform, one might claim a mutual mistake of fact in that neither party contemplated the impossibility. However, something more than this must be present, namely, a "joint enterprise," which is lacking in the instant case.

Defendant's reliance on our decisions of Sperry Rand Corp. v. United States, 475 F.2d 1168, 201 Ct.Cl. 169 (1973), and Clavier Corp. v. United States, 202 Ct.Cl. 1098 (1973) (Order of June 29, 1973, adopting the trial judge's Opinion), is misplaced. Those cases dealt with the assumption of risk by a contractor in a fixed-price contract that eventual cost of performance will exceed anticipated cost. This is entirely different from the assumption of risk that the specifications will prove impossible to perform.

## VI

### Defendant's Waiver Defense

■ Defendant maintains that any recovery rights, which plaintiff might otherwise have, were waived at the October 4, 1967 meeting, because plaintiff did not at that time expressly reserve any right to claim an equitable adjustment. But the evidence of the October 4 meeting shows no discussion of costs whatsoever. If what had been involved in that meeting was a "change" which was to cause a subsequent increase in plaintiff's costs, then plaintiff could have been obligated under the contract to apply for an equitable adjustment within 30 days.[26]

However, the agreement of October 4 did not mark an *increase* of costs, but rather was (or should have been) the *termination* of those costs which are recov-

erable because they were incurred in the attempt to achieve impossible requirements. Actually, in this instance as a result of the Government's reneging on its October 4 agreement, plaintiff continued to incur costs beyond October 4 and even beyond May 17, 1968, when it made its claim to the contracting officer.

We can find no prejudice to the Government resulting from plaintiff's failure to reserve expressly a claim for costs at the time of the agreement on October 4. At that point the harm had been done, and plaintiff had been authorized to fabricate the boiler, thereby completing the contract. Contrast Ling-Temco-Vought, Inc. v. United States, 475 F.2d 630, 201 Ct.Cl. 135 (1973), wherein the contractor delayed in asserting a breach of contract by the Government, and, by continuing to incur costs, increased greatly the damages for which the Government would have been liable.

Finally, defendant's affirmative defense of waiver was not raised before the Board, nor was it stated in "Defendant's Answer," as required in our Rule 37(b).

## VII

### Conclusion *

We hold that the AGC–19 contract was impossible to perform, that the Government must bear the risk of impossibility, and that plaintiff has not waived its claim. Plaintiff is thus entitled to recover an equitable adjustment, pursuant to the "Changes" clause, of costs incurred in attempting to meet faulty specifications.

Plaintiff's Motion for Summary Judgment is granted; defendant's cross-motion is denied. Since the parties have not yet had an opportunity to present proof of costs, this case is remanded pur-

---

**25.** See *Natus Corp., supra*, 371 F.2d at 458, 178 Ct.Cl. at 13–14 (1967), for an analysis of the holding in the *National Presto Industries, Inc.* case.

**26.** The "Changes" clause required the contractor to assert a claim for adjustment "within 30 days from the date of receipt by the Contractor of the notification of change."

* The trial judge's original recommended conclusion has been changed in form by the court to conform to the provisions of Rules 149 and 150 which became effective October 1, 1974, after the recommended conclusion had been made.

suant to Rule 149 to the Armed Services Board of Contract Appeals for further proceedings in accordance with this decision (*i. e.*, for a quantum determination of an equitable adjustment under the "Changes" clause of the contract), with plaintiff's counsel being directed to advise the court by letter to the trial judge on the status of the proceedings at 90-day (or less) intervals.