**FRUEHAUF CORPORATION**

v.

**The UNITED STATES.**

**No. 446–76.**

United States Court of Claims.

Nov. 15, 1978.

Marion Edwyn Harrison, Washington, D. C., atty. of record, for plaintiff; Harrison, Lucey & Sagle, Washington, D. C., of counsel.

Ray Goddard, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, and BENNETT and SMITH, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case comes before the court on defendant's motion, filed September 28, 1978, under Rule 54(b)(3) (iii), moving that the court adopt the recommended decision of Trial Judge Lloyd Fletcher, filed May 31, 1978, under Rule 166(c), on plaintiff's motion and defendant's cross-motion for summary judgment, as the basis for its judgment in this case since neither party has filed a request for review thereof by the court and the time for so filing pursuant to the Rules of the Court has expired.

Upon consideration thereof, without oral argument, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the decision as the basis for its judgment in this case. Therefore, plaintiff's motion for summary judgment is granted, defendant's cross-motion for summary judgment is denied, judgment is entered for plaintiff and the case is remanded to the U.S. Postal Service Board of Contract Appeals for further administrative proceedings not inconsistent with this opinion with proceedings in this court stayed for a period not to exceed six (6) months. Counsel for plaintiff is designated to furnish periodic advice as to the status of the proceedings on remand pursuant to the requirements of Rule 149(f).

## OPINION OF TRIAL JUDGE *

FLETCHER, *Trial Judge:* This contract dispute involves an appeal by plaintiff, Fruehauf Corporation, from a decision of the U.S. Postal Service Board of Contract Appeals, PSBCA No. 479 dated February 14, 1973. See 73–1 BCA ¶ 9897. The Board held that plaintiff was not entitled to various claims for equitable adjustment arising out of its performance of a contract for the installation of mechanical mail handling equipment in the United States Post Office at San Juan, Puerto Rico. The Board also denied a counterclaim asserted by the Government in that proceeding. By cross-motions for summary judgment, the parties have asked the court to review the Board's decision in accordance with the well-known standards of Wunderlich Act, 41 U.S.C. §§ 321–22.

The basic facts do not appear to be in substantial dispute, although plaintiff does criticize a number of the Board's findings as being irrelevant, incomplete, and therefore misleading, "out of focus," out of context, and even "naive." The contract, which was entered into on June 29, 1964, provided for the furnishing and installation of a mechanical mail handling system in a new post office building that was to be constructed by another contractor at San Juan.[1]

It resulted from the issuance of an invitation for bids by the Post Office Department

---

* The trial judge's recommended decision and conclusion of law are submitted in accordance with Rule 166(c). The necessary facts are stated in the opinion.

1. On or about the same day, i. e., June 29, 1964, plaintiff and defendant also entered into a similar contract for the installation of a mail handling system in a new post office building to be constructed by another contractor in Toledo, Ohio. Plaintiff also had such contracts for mechanization installations at Greensboro, North Carolina, Cincinnati, Ohio, and Sacramento, California. The Toledo contract, as with the present one, also became the subject of an appeal by plaintiff to the Postal Service Board of Contract Appeals, No. 478, followed by an appeal to this court. That dispute has been the subject of a decision by Senior Trial Judge White filed January 10, 1978, and adopted by the court on April 4, 1978. *Fruehauf Corp. v. United States,* 578 F.2d 1389 (Ct.Cl., 1978).

(POD), the submission of a bid by plaintiff, and an acceptance of that bid by POD. The contract was a fixed-price supply contract, the original fixed price being $292,417 which was subsequently modified to $368,-413. It contains the standard changes, disputes, and suspension of work clauses but contains no liquidated damages article. With regard to the question of when the installation of the mechanical mail handling equipment was to be accomplished in the yet-to-be-constructed building, paragraph 4.2 of the IFB stated in substantial part as follows:

> 4.2 Completion Date—The Contractor shall have the installation completed, tested and ready for operation concurrently with the completion of the building. The best information available at this time indicates that the contract for building construction will be awarded on or about June 1, 1964, and that 18 months will be required to complete the building. The Contractor must coordinate the work under this contract with other contractors involved. See Section 3.16.1. On this basis, the completion date for this contract will be August 1, 1965. If the work under this contract is delayed by acts of God or for other reasons stated in paragraph 11, Standard Form 32, extensions of time and relief from excess costs shall be governed by the terms of paragraph 11. If the work under this contract is unreasonably delayed by the Government, an equitable adjustment in time of performance and/or contract price will be governed by the Suspension of Work Clause of the contract. If the work under this contract is unreasonably delayed by the lessor, his contractors or subcontractors as a result of the Government delaying them unreasonably, such delay shall be considered to have been caused by the Government and shall be treated in accordance with the Suspension of Work Clause. On the other hand, if the Contractor inexcusably delays the lessor, his contractors or subcontractors, he shall be liable for any additional costs incurred by the Government as a result of any equitable adjustment in time of performance or contract price granted to the lessor, his contractors or subcontractors involved. * * *

Only a few days prior to the award of the contract in question, the defendant contracted with Beacon Construction Company, Boston, Massachusetts, to erect the building in which Fruehauf was to install the mechanized mail handling system. Beacon then subcontracted the erection of the Post Office building to AMECO.

By the fall of 1964 it had become apparent that foundation problems at the site of the proposed building would delay construction and would make unrealistic the construction date estimated in paragraph 4.2, *supra*. In fact, it is recorded in the minutes of an October 14, 1964 construction meeting that AMECO had forwarded a construction schedule showing a completion date for the building on March 1, 1966. During late 1964 some correspondence ensued between Fruehauf and defendant with respect to the construction schedule and the starting date for the mechanization installation.

On March 10, 1965, Fruehauf wrote to the defendant stating that its suppliers were fabricating materials and equipment which would mean bulk shipment to the jobsite in late August 1965. The letter went on to request an estimate of the completion date for the building based on current circumstances. On March 24, 1965, defendant replied to Fruehauf's inquiry by letter stating in part:

> The delay in construction of foundations for the new Post Office building in San Juan now indicates that the installation of mechanization equipment cannot be started in August [sic-probably should be "September"] 1965 as scheduled.

Following another construction meeting held in April 1965, the defendant wrote Fruehauf, stating:

> Due to foundation construction difficulties accurate determination of the completion date for the building has been very difficult to forecast. These foundation difficulties have now been resolved and construction is in progress. Al-

though we do not have a definite completion date established by the building contractor as of this date, it appears that this building should be ready for occupancy by the Post Office Department on September 15, 1966. On this basis the completion of [your] contract should be tentatively scheduled as October 15, 1966. In accordance with the contract specifications this completion date is to be preceded by a 30-day operating run-in test period.

When we have received a firm completion date from the building contractor you will be immediately advised and requested to submit a new schedule for mechanization in accordance with this date.

Fruehauf wrote to defendant acknowledging receipt of the aforesaid information and requested the issuance of a "formal suspension of installation." In addition, Fruehauf requested approval of a plan whereby its machinery suppliers, on furnishing Fruehauf with a certificate of completion and an agreement to install and protect items for this contract, could bill Fruehauf therefor, and thereupon defendant would reimburse Fruehauf. In October 1965, defendant advised Fruehauf that AMECO had submitted a firm schedule to complete the building for occupancy by October 1, 1966, and accordingly, defendant asked Fruehauf to submit its schedule for completion of installation ready for operation and the commencement of the 30-day test period on that date. Defendant further stated that Fruehauf's request for an issuance of a suspension of work order was under evaluation. On February 18, 1966, Fruehauf furnished defendant its erection schedule.

At a February 24, 1966 building-mechanization joint meeting it does not appear that the completion date of October 1, 1966, exclusive of the 30-day operating test period, was affirmed. However, it does appear that Fruehauf was advised that portions of the first floor area would be available for it on May 2, 1966, such portions to be turned back to AMECO for completion by July 29, 1966. Portions of the second floor area were to be made available to Fruehauf on a joint occupancy basis on May 23, 1966, and on an exclusive occupancy basis by May 30. No mention is made in the minutes of the meeting regarding Fruehauf's attitude towards the short lead time provided.

As previously mentioned, Fruehauf had contracts with defendant to provide several mechanized mail handling systems simultaneously with the San Juan contract. Because of concern over problems related to the scheduling of materials, Fruehauf employed a procurement consultant, C. O. Nelson, of Anaheim, California, to assist in obtaining a timely flow of materials to the various projects, particularly in regard to the San Juan contract. Nelson began this work on or about March 3, 1966.

At the time of Nelson's arrival, plaintiff's procurement and material control organization consisted of five people, namely: a purchasing manager, an agent, a person who performed some material control and some internal coordinating functions, and two clerical employees. In Nelson's view, when consideration was given to plaintiff's several, other on-going projects of a similar nature, its five-person staff would have been "taxed" to do the procurement necessary for the work under this contract in San Juan.

He thought that, because of slippages in the construction schedules of the various projects, plus the short mobilization time of 66 days for the San Juan project (i. e., February 24–May 2), the procurement and material control problems posed by the San Juan contract were accentuated and beyond the normal capability of plaintiff's regular staff. Therefore, Nelson sought and obtained permission to employ four additional people to take full charge of and perform the procurement function for the San Juan mechanization installation.

In 1964 and 1965, apparently as a precautionary matter, plaintiff had issued some purchase orders for such items as roller tables, monorails and supports, motors, bearings, belts, pulleys, rollers and standards, some of which could be expected to be comparatively slow in delivery times.

These items constituted but a few of the large number of purchase orders contemplated for the performance of the mechanization installation. Three purchase orders for power turns were issued on February 18, 1966, but the largest number of purchase orders was issued after Nelson was employed in March 1966. The issuance of these orders began on or about March 17, 1966, and their issuance had been substantially completed by April 29, 1966. Approximately 50 purchase orders were issued during this time and these orders were for such items as chutes, conveyors, slides, conveyor drives, and related pieces.

Many requisitions for materials for the mechanization installation had been prepared by Fruehauf's regular complement before Nelson was employed. Most of the materials, however, had not been ordered because of continuing uncertainty at that time regarding when the building actually would be ready for plaintiff's mechanization work. Fruehauf had estimated that materials would be shipped at various times after the issuance of the purchase orders, depending on the particular kind of material described in an individual purchase order. However, Fruehauf had underestimated the shipment times. Except in rare instances, suppliers' shipments were made from four to six weeks later than estimated. For example, the custom steel material ordered was received, at times, in partial shipments and, in all instances, weeks and sometimes months after the issuance of the purchase order. On the other hand, the bulk items that were ordered, such as pulleys, bolts, some chains and sprockets were usually received with less delay.

The purchasing of certain items such as motors, bearings and pulleys had begun in 1964, and some purchasing was done in mid-1965. However, after that time there was a lapse in the placing of purchase orders until just before and just after the February 24, 1966 job conference in San Juan. It can reasonably be inferred that at least one reason for the lapse of such purchasing during the latter half of 1965 and in January 1966 was continuing uncertainty as to the time when the site would finally become available to plaintiff. The receipt of materials would only have posed difficult problems of storage and protection.

Plaintiff's field superintendent, D. J. Stevenson, arrived in San Juan on April 28, 1966, to attend a job meeting. After that meeting he returned to mainland United States for a few days and then went back to San Juan on May 5 to supervise the mechanization installation. Meanwhile, the first shipments of material had begun to arrive on the jobsite. As might be expected with sea-borne shipments, the material that arrived was not necessarily related to the installation schedule and some material arrived that could not be installed until late in the progress of the project. Consequently, such material had to be stored or had to be utilized in "bits and pieces" which forced workmen to move from one part of the system to another. This situation was a contributing factor in slowing progress, and it continued throughout the history of the project until October, by which time essentially all of the material was on site.

During May, approximately eight container loads of such items as motors, monorail chains, and related equipment were received, but the majority of this material was equipment that would not be used until much later in the progress of the work. In addition, neither the hand tools nor the drawings and specifications were at the jobsite until about May 16. Other necessary tools did not arrive until June 22 or June 23, and until these tools arrived, Fruehauf's activity was necessarily restricted to unloading material and doing a small amount of layout and steel erection.

The physical conditions at the site were "exceptionally poor". Both plaintiff's superintendent and the POD's resident engineer, agreed they were the worst they had ever seen. For example, AMECO furnished no toilet facilities, drinking water, or lighting, until late September.

When AMECO would finish in a particular area, all tools and equipment would be left in place until needed elsewhere. Concrete and plaster droppings, panels, bits and

pieces of steel, and remnants of scrap and debris were left on the floor by AMECO's employees when they finished in an area. There was water in the tunnel area of the building intermittently from May until late September. This condition was so bad at times that work had to stop, and one time, some of the equipment that Fruehauf had installed was submerged and damaged to such an extent that the cleaning and restoration of the equipment to operating condition required ten days. There was substantial interference with Fruehauf's work by AMECO's workmen so that Fruehauf had to yield certain areas in order that other workers could occupy and work in various spaces. These conditions and interferences caused a 25 percent loss of efficiency by Fruehauf during the period from May through mid-November.

In addition to the foregoing deplorable site conditions, the efficient performance by Fruehauf of the work required by its contract was impeded by the condition of the building as it had been, and was being, constructed by AMECO and its subcontractors. The Board described the major problems as follows:

a. . . . [F]ar and away, the most troublesome of all the building deficiencies were the inserts, which are devices placed in a ceiling for the purpose of supporting equipment or other material. Because the building contractor or its subcontractors placed these inserts so irregularly and out-of-line, Appellant had to replace 225 of them. If an insert were out of alignment, but not sufficiently so to permit the placement of another insert beside it, it was necessary to modify the header steel to accommodate a dual insert. It was agreed that Appellant would replace the inserts as necessary and the building contractor would reimburse Appellant.

b. Light fixtures were so placed by employees of the building contractor or its subcontractors as to interfere with the installation of a conveyor or a monorail, and they had to be replaced or suspended in another manner. Because Appellant's employees were not allowed to do this work, the re-placement or re-suspension of the lighting fixtures at such locations or in such manner that Appellant could perform its work caused a considerable loss of time to Appellant. In addition, the limited quantity of materials on hand with which to work caused such interferences as light fixtures, pipes, etc. to have a far greater impact on this job than the same interferences would cause on a job being performed in the United States mainland.

c. Floors were uneven requiring the use of grout or shims for floor-based equipment in order for it to be level.

d. Ceilings at columns were near design level but they sagged as much as 2″ to 2¼″ between columns. This condition required extensive compensating modifications to header steel or hanger steel.

e. Dump hole aprons had not been installed when Appellant went on the site. This apron is a piece which must be installed before the chutes can be installed. This was a relatively minor problem and it was corrected in a few days. This problem occurred early in the history of Appellant's performance, and by the time the proper tools had arrived (late June) the problem had been resolved.

f. An interference problem arose because of the location of water pipes adjacent to columns on or near which mechanization equipment (a slide) was to be installed or by which it had to pass. This matter was called to the attention of the building contractor, but some six weeks passed before the situation was corrected. However, in this instance, Appellant's men were able to perform other necessary work during the period the pipes were being relocated, so that there was no lay-off and no one was without work.

g. There was a shortage of electrical power. Appellant sought assistance from the building contractor, the power company in Puerto Rico and Respondent. Gasoline-powered generators were sought locally but none was available. No effort was made to have such a generator shipped from the mainland.

h. Inadequate dock space was made available to Appellant by the building contractor and this complicated the problem of unloading materials and getting them into the building.

i. The building contractor did not grant Appellant sufficient access to the elevator until about the middle of October. This fact was the source of some inefficiency, the exact amount of which was not estimated.

In general, plaintiff is in agreement with the foregoing description of the major building deficiencies, except it objects to any implications that it was either at fault or had any power or contractual obligation to do anything about them. It does seem clear that plaintiff's estimate that the building conditions enumerated caused a 25 percent loss of efficiency from May through about the third week of October is reasonable.

By October 1, 1966, essentially all materials needed had arrived at the jobsite, and plaintiff was working all over the building in an attempt to complete the job (less the test period) by November 1, 1966.

Beginning in September and running through the first half of December 1966, defendant issued approximately 23 field orders for changes in the installation. These tasks were later combined into 11 or 12 written change orders. Performance of the job, including the required 30-day test period, was completed by plaintiff on December 16, 1966.

Fruehauf claims that the said change orders impacted on the unchanged work and caused a 20 percent loss of efficiency during the applicable period.

On the foregoing facts which constitute a summary of the extensive and well-supported findings made by the Board, Member William A. Duvall (Member John Lewis concurring) denied both Fruehauf's appeal from the contracting officer's adverse deci-

sion and the Government's counterclaim related thereto. The reasons for the denial are summarized in a "Recapitulation of Points on Liability," as follows:

1. Appellant [Fruehauf] encountered delay in completion of its work to install mechanization equipment in the San Juan postal facility.

2. The delay encountered by Appellant was caused by the fault or negligence of (a) the building contractor, (b) Appellant's employees,[2] and (c) perhaps by Appellant's suppliers and the carriers which transported materials and supplies intended for Appellant.

3. Respondent [POD] was diligent in its efforts to avoid delay and mitigate Appellant's extra costs and damages. The delays, extra costs and damages experienced by Appellant were not due to the fault or negligence of Respondent nor were they brought about for the convenience of Respondent.

4. Respondent was not required to terminate the contract of the building contractor because of the failure of the latter fully to cooperate with Appellant. Such termination action would have been ill-advised because of the additional delay it would have caused, with the accompanying additional expense to Appellant.

5. Even if evidence in this case established, which it does not, that Respondent's fault or negligence did contribute to the delay encountered by Appellant, other evidence clearly shows that Appellant's fault and negligence were a considerable, but unidentified, part of the cause of that delay.

CONCLUSION NO. 3. Appellant may not, under the circumstances here present, recover from Respondent any excess costs or damages it may have sustained as the result of delay experienced by Appellant in the performance of the work required under the subject contract.

---

2. There is credible evidence in the record that, because of their inexperience in this kind of work, the local (San Juan) workers employed by Appellant contributed to Appellant's delayed performance. As used here, however, the word "employees" is intended to mean, primarily, Appellant's home office employees and management who caused delay in procurement.

In thus placing on Fruehauf the entire risk of unreasonable delays and substantial inefficiencies directly caused by the Government's other contractor on this project, it seems to me clear that the Board has erred as a matter of law. In doing so, the Board has relied heavily on the decision by this court in *Ben C. Gerwick, Inc. v. United States*, 285 F.2d 432, 152 Ct.Cl. 69 (1961). There Gerwick's contract called for the construction of a quy wall, piers, and mooring platforms at a Naval shipyard. Another contractor was engaged to do the required preliminary excavation and dredging. The Government was to furnish the necessary steel piles. Gerwick's performance was seriously delayed because of (1) delays by the dredging contractor in making the site available for Gerwick's use, and (2) delay by the Government in furnishing the steel piling. In considering Gerwick's breach of contract action, the court allowed that part of the claim relating to the Government's delay in furnishing the steel piles. However, it denied that part of the claim relating to delayed site availability, stating at 285 F.2d 436, 152 Ct.Cl. 77:

> The delay in availability of the site of plaintiff's work resulted from the delays by the dredging contractor in the performance of the dredging contract. It follows that if the defendant was not at fault, it is not liable in damages for the delays caused by another contractor. *Standard Accident Insurance Co. v. Unit-* *ed States*, 102 Ct.Cl. 770, 790, cert. denied 325 U.S. 870, 65 S.Ct. 1409, 89 L.Ed. 1989. Furthermore, unless the Government expressly covenants to make the site available at a particular time, plaintiff has the burden of proving that the United States was in some way at fault because the site did not become available to it at an earlier date. *United States v. Foley Co.*, 329 U.S. 64, 67 S.Ct. 154, 91 L.Ed. 44. Since plaintiff has failed to prove fault or negligence on the part of the United States, his claim, in this respect, must fail.

*Gerwick* is clearly distinguishable from the present case. It was a breach of contract suit, not as here, an equitable adjustment claim. Even more important is the fact that *Gerwick* was decided before the use of the suspension of work clause had become widespread in Government procurement. The absence of such a clause in the *Gerwick* contract no doubt accounts for the court's above-quoted requirement that *in a breach of contract setting* the delayed contractor must prove "that the United States was in some way at fault because the site did not become available to it at an earlier date."

Here, by way of contrast, the contract not only contained a typical suspension of work clause,[3] but Fruehauf specifically requested the contracting officer to invoke it, all to no avail. That an actual suspension order was never issued is, of course, immaterial since a *constructive* sus-

3. The clause reads as follows:

"(a) The contracting officer may order the contractor in writing to suspend all or any part of the work for such period of time as he may determine to be appropriate for the convenience of the Government.

"(b) If, without the fault or negligence of the contractor, the performance of all or any of the work is, for an unreasonable period of time, suspended, delayed or interrupted by an act of the contracting officer in the administration of the contract, or by his failure to act within the time specified in the contract (or if no time is specified, within a reasonable time) an adjustment shall be made by the contracting officer for any increase in the performance of the contract (excluding profit) necessarily caused by the unreasonable period of such suspension, delay or interruption, and the contract shall be modified ac- cordingly. No adjustment shall be made to the extent that performance by the contractor would have been prevented by other causes even if the work had not been suspended, delayed or interrupted. No claim shall be allowed (i) for any costs incurred more than twenty days before the contractor shall have notified the contracting officer in writing of the act or failure to act involved (but this requirement shall not apply where a suspension order has been issued), and (ii) unless the claim, in an amount stated, is asserted in writing as soon as practicable after the termination of such suspension, delay, or interruption, but not later than the date of final payment, under this contract. Any dispute concerning a question of fact arising under this clause shall be subject to the Disputes Clause."

pension has the same effect and consequences as an actual suspension, and relief should be granted as if an actual suspension order had been issued. *Merritt-Chapman & Scott Corp. v. United States*, 528 F.2d 1392, 1400, 208 Ct.Cl. 639, 655 (1976). *See also, Urban Plumbing & Heating Co. v. United States*, 408 F.2d 382, 187 Ct.Cl. 15 (1969), *cert. denied*, 398 U.S. 958, 90 S.Ct. 2164, 26 L.Ed.2d 542 (1970); and *Jefferson Const. Co. v. United States*, 368 F.2d 247, 177 Ct.Cl. 581 (1966).

Despite what seems to me to be its obvious relevancy, the case of *Merritt-Chapman & Scott Corp. v. United States*, 429 F.2d 431, 192 Ct.Cl. 848 (1970) does not appear to have been drawn to the Board's attention during its consideration of this case. There the court in a *per curiam* opinion had this to say about the operation of the suspension of work clause in cases where the delay was in no way attributable to Government fault, dereliction, or responsibility:

> * * * There is no doubt, * * * that the work was in fact suspended and delayed for the Government's convenience, and also that there was a significant change in design. *It is immaterial, in this instance, whether or not the suspension and delay was due, in whole or in part, to the Government's fault. There are occasions for the Suspension of Work clause to operate when the Government is at fault, as we recently noted* (See *Chaney & James Constr. Co. v. United States*, 421 F.2d 728, 731–33, 190 Ct.Cl. 699, 705–08 (1970), *but the clause can likewise be effective, as we have also held, when there is a suspension not due to the Government's fault, dereliction, or responsibility.* See *T. C. Bateson Constr. Co. v. United States*, 319 F.2d 135, 162 Ct.Cl. 145 (1963); *John A. Johnson & Sons v. United States*, 180 Ct.Cl. 969

(1967). *An instance of the latter category is a suspension and delay which lasts so long (regardless of the absence of government fault) that the contractor cannot reasonably be expected to bear the risk and costs of the disruption and delay.* That is one type of suspension and delay "for an unreasonable length of time causing additional expense", within the meaning of the clause. Depending on the circumstances, *a delay due to a non-fault suspension by the Government can obviously be so protracted that it would be unreasonable to expect the contractor to shoulder the added expense himself.* We think that in its terms and its purpose the Suspension of Work clause covers that situation, among others. [Emphasis supplied.] 429 F.2d at 432, 192 Ct.Cl. at 852.

To the same effect, see *John A. Johnson & Sons v. United States*, 180 Ct.Cl. 969, 990 (1967). Compare, however, *Paccon, Inc. v. United States*, 399 F.2d 162, 185 Ct.Cl. 24 (1968) where the court appears to indicate in its opinion and footnotes 3 and 10, that Government fault is a *sine qua non* to the invoking of the suspension of work clause. This dictum seems to me to have been modified by the later *Merritt-Chapman* decision as quoted above.

■ By its repeated emphasis throughout its opinion that the POD was in no way negligent or at fault in the circumstances that caused Fruehauf's delay, it does not appear that the Board applied the *Merritt-Chapman* principles to this case. It can hardly be disputed that the delay in site availability for over 15 months was unreasonable. In fact, this exceeds the 419-day period found to be unreasonable in *Merritt-Chapman, supra.*[4] And in both that case

---

4. This unreasonable delay period in itself is sufficient to distinguish the other Fruehauf Corporation cause involving a similar contract for the installation of a mechanical mail handling system in a yet-to-be constructed post office building in Toledo, Ohio. See *Fruehauf Corp. v. United States*, 578 F.2d 1389 (Ct.Cl.) cited in n. 1, *supra*. There the delay period was only approximately two months, and the build-

ing deficiencies encountered by plaintiff were, on substantial evidence, found to have been "relatively minor in nature and of the sort frequently encountered at construction projects . . ." See opinion of Trial Judge filed January 10, 1978, and adopted by order of the court on April 4, 1978, at 10, 12–13. Thus, a far different factual situation was involved in the Toledo case than in the present one where the

and this one, the Government was found to be without fault or negligence in causing the delay. Nonetheless, in *Merritt-Chapman* the contractor was held entitled to an opportunity to obtain an equitable adjustment in the contract price. Certainly, Fruehauf should be entitled to no less.

It is true that, under the suspension of work clause, the plaintiff-contractor must also be without fault or negligence contributing to the ensuing delay. The Board's opinion finds fault with Fruehauf's procurement procedures in this case. However, there is nothing in its findings which indicates that those procedures caused any delays in obtaining access to the jobsite. Some material and tool procurement difficulties did arise once Fruehauf was able to enter the building which even then appears to have been in deplorable condition. As far as can be determined from the record, the major reason for Fruehauf's slowness in placing earlier material orders was the confusion and continuing uncertainty as to when the building would be made available to it. This was compounded by the problem of where to store and protect materials that might have arrived in San Juan long before the site was available to Fruehauf. Under the circumstances as they developed in this case, it obviously would have been foolhardy indeed for Fruehauf to have proceeded with its procurement on the assumption that the original contract completion date of August 1, 1965, was a firm date. Actually, as stated, site availability for Fruehauf was delayed from February 1, 1965 to May 2, 1966, or approximately 15 months. As plaintiff observes, there is simply no evidence "to support the wisdom of extensive procurement in 1964 and 1965 as to a contract with an on-site date unknown until February 24, 1966," the date of a joint-job conference in San Juan.

The Board further makes much of its conclusion that any delays, extra costs, and damages experienced by Fruehauf were not brought about for the Government's convenience as required by paragraph (a) of the

suspension of work clause. In arriving at this conclusion, the Board does not appear to have been making a finding of fact but rather making a conclusory *ipse dixit.* The facts all point to an opposite conclusion. Confronted as he was with an incredibly slow and inefficient performance by the building contractor, the contracting officer had several options. The most obvious one, of course, was termination of the building contract either for default or for the Government's convenience. He chose not to exercise either option since, as pointed out in *Gerwick, supra,* such a course of affirmative action would only serve to further delay POD's occupancy of the new post office building. He could, and did, make periodic complaints to the building contractor, and its subcontractor, although these complaints appear to have consisted mostly of what plaintiff calls the "wringing of hands." The only party inconvenienced in this three-way set-up was plaintiff.

From what has been said above, it should be apparent that in my opinion Fruehauf must be given an opportunity by the Board to show, as best it can, the amount of an equitable adjustment to which it is entitled under the suspension of work clause because of the unreasonable delay described. At this point, however, it is important to note a singular nuance in plaintiff's theory as to the proper computation of its equitable adjustment. At page 21 of its Brief in Opposition to Defendant's Motion for Summary Judgment, it summarizes its contentions thusly:

> (1) Plaintiff caused *none* of the 456 day site availability delay at bar. (2) *Plaintiff's claims are not for costs arising during, or attributable to, that unreasonable delay, but for the manner in which Defendant finally ended the delay by (a) accelerating on-site, (b) providing a defective building and (c) permitting disruptive working conditions.* In other words, neither the building nor Beacon was ready for Plaintiff when Defendant finally rushed Plaintiff on to the site. [Emphasis supplied.]

delay period was 15 months and the site conditions were described by all knowledgeable witnesses as "the worst they had ever seen." P. 8, *supra.*

This seems to be something more than a "ripple effect"[5] theory and may well have been developed by plaintiff's present counsel in an effort to overcome any difficulties of proof incident to showing significant damage flowing from the 15-month delay period itself. Thus, in addition to claiming that it was damaged following the *end of the delay period* through a consequent Government-forced acceleration, Fruehauf claims to have been further damaged by the Government's furnishing it a defective working site which seems at least somewhat analogous to a typical claim arising out of defective Government-furnished equipment. *See, e. g., Ekco Products Co. v. United States*, 312 F.2d 768, 160 Ct.Cl. 75 (1963) (holding that where the Government agrees to furnish equipment to the contractor, there is an implied warranty that such equipment will be suitable for its intended use). To like effect is *S. S. Mullen, Inc. v. United States*, 389 F.2d 390, 182 Ct.Cl. 1, (1968) (*Government-furnished aerial tramways and supporting towers*); *Thompson Ramo Wooldridge Inc. v. United States*, 361 F.2d 222, 175 Ct.Cl. 527 (1966); *Topkis Bros. Co. v. United States*, 297 F.2d 536, 155 Ct.Cl. 648 (1961). *Cf. Chris Berg, Inc. v. United States*, 389 F.2d 401, 182 Ct.Cl. 23 (1968); *Koppers/Clough v. United States*, 201 Ct.Cl. 344 (1973).

The theory is an appealing one but is difficult of application in a "suspension of work" context, although, of course, the damage to a contractor in a typical defective GFE case will consist largely of delay. Also, unlike the present case, the defective GFE cases appear generally to have involved the furnishing of tangible personal property.[6] They are, therefore, of doubtful relevancy except by way of analogy.

It is perhaps not amiss to observe that in cases where the Government has sought to accomplish a single objective by contracting with two unrelated contractors, one of whom delays the other, as here, the problem becomes one of where the risk of financial loss should be allocated as between the Government and the innocent contractor. Professor Nash in his thoughtful article "Risk Allocation in Government Contracts," 34 Geo.Wash.L.Rev. 693 (1966) has summarized the problem as follows at 718:

> Generally, the Government and the contractor thoroughly spell out the agreed risk allocation in the contract document. The pricing provisions are the major risk allocation device since they govern overall compensation and specifically set forth the responsibility for cost increases. Contract clauses allocate cost responsibility for more specific occurrences that can be foreseen. *Many contracts, however, do not adequately balance total risk allocation, particularly fixed price agreements where the contract clauses make the contractor liable for extra costs caused by Government action or inaction or some force entirely outside of the contractor's control.* [Emphasis supplied.]

There can be little doubt on this record that, when at last the Government decided the site was ready for plaintiff, the latter was forced into a crash mobilization period of some 35 days less than the 100-day period originally anticipated. Thus was Fruehauf's work seriously accelerated although, singularly enough, there is no indication that Fruehauf made any formal protest of such compacted lead time. Of even more importance is the fact that when Fruehauf was finally allowed on site, it found a building with serious structural defects and other deficiencies.

Essentially, this deplorable situation was the fault of neither plaintiff nor the Government. It was directly the fault of

---

5. The phrase was elaborated upon by Joel P. Shedd, Jr., former member of the Armed Services Board of Contract Appeals, and refers to the impact effect of delays and changes on unchanged work. See Shedd, *The Rice Doctrine and the Ripple Effects of Changes*, 32 Geo.Wash.L.Rev. 62 (1963).

6. *Cf. S.S. Mullen, Inc., supra*, where the defective Government-furnished property was typical *real* property, as here. It is noted, however, that even there the GFP clause stipulated that the tramway and supporting tower should not be treated as "a fixture or lose its identity as personalty by reason of affixation to any realty." 389 F.2d 400, 182 Ct.Cl. 20.

an incompetent subcontractor employed under the other contract involved to build the building. Neither party can reasonably be held to have foreseen this development.

It seems to me that, under the present contract, the only equitable way to allocate such unforeseen risk as between the innocent parties is by way of an equitable adjustment under the suspension of work clause. For an example of such an allocation, see *John A. Johnson & Sons v. United States, supra.*

■ Indeed, in this very case, the contracting officer endeavored to make such an allocation of risk (without, however, so denominating it) by offering Fruehauf some $32,000 in his final decision as a "contracting officer's allowance." Dissatisfied with the amount thus offered, Fruehauf duly appealed to the Board where it was totally unsuccessful.[7]

Since the Board erred, however, for the reasons previously given, the case must be returned to it for a determination on the existing record, supplemented as deemed by it appropriate, of the amount of equitable adjustment to which plaintiff is entitled on a reasonable allocation of an unforeseen risk encountered by both parties.

■ Finally, there remains for consideration what plaintiff refers to as its "Impact Claim." It describes the claim thusly:

During the last two and a fraction months Defendant issued a barrage of field orders directing changes, thereby further impacting Plaintiff's efficiency, already suffering from acceleration, site defects and building structural defects.

In describing the impact of the approximate 12 change orders incorporating some 23 additional tasks, plaintiff's witnesses testified that the changes had contributed a 20 percent loss in efficiency with respect to the unchanged work and caused an additional expenditure of 2,165 man-hours of labor. Despite the fact that this testimony appears to be essentially uncontroverted, the Board denied the claim because Fruehauf "has failed to sustain the burden of proving entitlement to any recovery based on alleged acceleration and other impact on unchanged work caused by the issuance of change orders." Bd.Op. p. 45. This conclusion appears to be based on the Board's belief that, even if Fruehauf were required to accelerate its work, such acceleration "was made necessary by delays caused in part by the building contractor and in part by Appellant [Fruehauf], its suppliers or shippers." *Ibid.* For reasons already explained above, the record in my opinion does not contain substantial evidence that Fruehauf was either negligent or otherwise at fault in its procurement activities to the extent that it can be said to have contributed to its acceleration problems.[8] But for the negligence and gross inefficiency of the building subcontractor as described by witnesses for both plaintiff and the Government, it seems to me entirely clear that Fruehauf would have performed this contract without resorting to a crash program of acceleration.

Accordingly, I conclude that, on remand for determination of a proper equitable adjustment, the Board must take into account not only Fruehauf's losses, if any, attributable to the initial delay period itself but also those losses which flowed from its compacted lead time and subsequent acceleration.

For the foregoing reasons, plaintiff's motion for summary judgment is granted and defendant's cross-motion for summary judgment is denied. Pursuant to Rule 149, the cause is remanded to the Board for further administrative proceedings not inconsistent with this opinion. Proceedings in

---

7. On brief here, plaintiff seems to claim, without clearly articulating it, that in all events the "contracting officer's allowance" entitles it to recover at least $32,000. Since the Board proceedings is *de novo*, however, this does not follow. *Monroe Garment Co. v. United States,* 488 F.2d 989, 1001, 203 Ct.Cl. 324, 345 (1973); *L. Rosenman Corp. v. United States,* 390 F.2d

711, 712, 182 Ct.Cl. 586, 588 (n. 2) (1968). The "contracting officer's allowance" was merely an offer which plaintiff rejected.

8. The Board even agrees in paragraph 5 of its Recapitulation that what it calls "Appellant's fault and negligence" cannot be identified. Bd.Op. p. 43.

this court are hereby stayed for a period not to exceed six months. Counsel for plaintiff is designated to furnish periodic advice as to the status of the proceedings on remand pursuant to the requirements of Rule 149(f).