### CONSOLIDATED MOLDED PRODUCTS CORP.

v.

### The UNITED STATES.

### No. 600–77.

United States Court of Claims.

June 15, 1979.

---

. . . . .

Maurice H. Bitner, Parsippany, N. J., attorney of record for plaintiff.

Jean Schepers, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant; Alvern C. Weed, June Weaver, and Joe Reeder, Dept. of the Army, Washington, D. C., of counsel.

Before NICHOLS, BENNETT and SMITH, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case comes before the court on defendant's motion, filed May 10, 1979, requesting that the court adopt the recommended decision of Trial Judge Fletcher, filed March 29, 1979, pursuant to Rule 166(c), on the parties' cross-motions for summary judgment, as the basis for its judgment in this case, neither party having filed a request for review thereof by the court, and the time for so filing pursuant to the Rules of the court having expired. Upon consideration thereof, without oral argument, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby grants defendant's motion and affirms and adopts the

recommended decision as the basis for its judgment in this case. Therefore, the Board's denial of plaintiff's claim must be sustained, and, accordingly, plaintiff is not entitled to recover. Plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, and the petition is dismissed.

## OPINION OF TRIAL JUDGE

FLETCHER, Trial Judge: This contract dispute involves an appeal by plaintiff, Consolidated Molded Products Corporation, from a decision of the Armed Services Board of Contract Appeals (Board), on December 7, 1976, designated as ASBCA No. 210168, 76–2 BCA ¶ 12, 177. The Board denied plaintiff's claim for $166,265 arising out of a dispute over a firm fixed-price contract for the supply of parts for certain antipersonnel mines. By cross-motions for summary judgment, the parties have asked the court to review the Board's decision in accordance with the well-known standards of the Wunderlich Act, 41 U.S.C. §§ 321–22 (1970).

On April 27, 1973, the U.S. Army Munitions Command awarded plaintiff contract No. DAAA 09–73–C–0238 for the delivery of 514,600 "MINE, APERS, M18A1, PARTS FOR" at a unit price of $2.63 or a total contract price of $1,353,398. The contract incorporated by reference to Standard Form 32 the standard "Changes", "Default", and "Disputes" provisions.

For nearly 8 years, plaintiff had supplied defendant with the same items, approximating nearly 5,000,000 units during that period. The above-described contract, in conjunction with: 1) the Government's exercise of an option for increased quantities under that contract, 2) remaining unfilled orders under a previous contract, and 3) a bid on an additional solicitation, resulted in the plaintiff contracting to supply an additional gross total of 1,247,740 units to the Government between November 1973, and January 1975.

However, during the last quarter of 1973, the United States experienced the onset of an "energy shortage" which quickly evolved into the well-remembered "energy crisis" as a result of an oil embargo imposed by certain producing nations in the Middle East, namely, the so-called OPEC group. The embargo resulted in severe shortages of petroleum and petroleum derivative products in the United States. Consequently, during the months following November 1973, plaintiff experienced increasing difficulty in obtaining petroleum-based resin products essential to the fulfillment of its previously described contractual obligations.

By mid-March of 1974, plaintiff had exhausted its total supply of epoxy resins, and no further shipments were forthcoming from its contract-designated supplier, Devcon Corporation. In addition, plaintiff had been unable to place purchase orders with any other suppliers on a firm price and delivery basis. Commencing on November 16, 1973, plaintiff kept the contracting officer fully advised of the deteriorating supply situation.

In a letter to the contracting officer dated May 1, 1974, plaintiff further outlined its supply situation. After noting that production had been stopped on April 3 due to the unavailability of epoxy resin, plaintiff explained that, because of the shortage of all petroleum derivative products, prices for such supplies as could be obtained had increased, and plaintiff had for the most part absorbed those increased costs. Plaintiff further believed that the only feasible solution was to terminate the balance of the order under contract 0238 and add those quantities to contract 0028 or to another solicitation. Plaintiff also stated that it had been advised the epoxy resin shortage would be a relatively short-term problem because the United States Department of Commerce had directed Devcon's supplier to provide Devcon with sufficient material to meet the plaintiff's needs. In any event, plaintiff was sure that it would "still be left with the problem of substantially higher material costs." Therefore, under separate cover, the contractor submitted four alternative proposals. Alternative I proposed a no-cost termination of contracts 0238 and 0028. The remaining three alternatives

called for shifting orders from contract 0238 to contract 0028 coupled with price adjustments.

The contracting officer responded to the above letter by a letter dated May 31, 1974, stating that the delivery delays resulting from the epoxy resin shortages would constitute an excusable delay within the meaning of the "Default" clause of the contract and that, consequently, the contractor was entitled to an equitable adjustment in the form of a delivery schedule revision. The letter went on to request a detailed breakdown of claimed additional expenses accompanied by citations to contractual authority under which entitlement to an equitable price adjustment could be claimed, and closed by advising that plaintiff's suggested alternatives for disposition of the contract remained under evaluation.

By mid-June 1974, plaintiff was able to advise that it had received commitments from Devcon for deliveries of a continuing supply of epoxy resins and that production had been resumed. On August 16, 1974, the contractor submitted the breakdown of its claim for increased expenses due to production interruption. The claimed amount was $166,265.

On November 8, the contracting officer responded to the plaintiff's submission by a letter denying any claim to an equitable price adjustment, and further refused the requested termination as not in the best interest of the Government. That decision was made final by the contracting officer in his opinion dated February 25, 1976. On appeal to the Armed Services Board of Contract Appeals, the contracting officer's denial of the contractor's claim was affirmed.

The essence of the plaintiff's contention before the ASBCA was that when supplies of the necessary epoxy resin became unavailable and the parties had no knowledge of when this condition would be relieved, the contract became impossible to perform. Therefore, in its view, plaintiff was constructively excused from further performance. When the epoxy resins again became available (albeit at higher prices), the resumption of production created a contract

*de novo* in the nature of a constructive change entitling the contractor to an equitable adjustment in the original contract price. In support of its position, plaintiff relied on the Restatement of Contracts, the Uniform Commercial Code, and a number of state judicial authorities. The Board felt it unnecessary to consider those authorities at length because of its conviction that Federal Government contract cases are controlled, not by state law, but by Federal law, citing *Penn-Ohio Steel Corp. v. United States,* 354 F.2d 254, 173 Ct.Cl. 1064 (1965). The Board was aware of no cases where any Federal authority had applied the cited principles in the Restatement and U.C.C. to a similar contractual framework and under similar factual circumstances. The Board went on to state its views as follows:

The parties are agreed that for a period in excess of two months sufficient epoxy resin to carry out the contract was unavailable. Appellant contends that this unavailability amounted to impossibility of performance. The Government, on the other hand, characterizes the same event as a "short term failure of a contract designated vendor." We do not understand appellant to be claiming that the impossibility of performance in this context consisted in "commercial impracticability," but if that is its claim, the cost disparity is not sufficient, in our opinion, to support such a finding. We view this aspect of the controversy as one primarily of semantics. The underlying facts remain unchanged: epoxy resin was unavailable, but the unavailability was one of relatively short duration. Regardless of how the parties characterize the situation, we are of the opinion that the contract did not lapse, nor was the risk of future performance shifted to the Government, because the ultimate fact remains that the parties specifically agreed to a remedy in the contract for the type of contingency that occurred and that remedy was applied in this case.

The "Default" clause * * * provides, in substance, that a contracting officer may terminate the contract for

default except in those cases where the failure to perform on time was due to an excusable cause such as an act of God, a fire, strike or *freight embargo,* and the like. In the event one of these excusable causes delays the contractor in his performance, the contract may not be terminated for default but, rather, the delay will be considered excusable and a *time* extension will be granted. As Government counsel points out, although the Arab oil embargo itself was not foreseen by the parties at the time of entering into the contract, the parties, through the Default clause, specifically ‘provided for the type of contingency that occurred. When the contingency happened appellant's performance was delayed, the delay was excused, but the obligation to continue performance when the cause for delay ceased to exist was neither terminated or excused. [Emphasis supplied.] [1]

So far as can be determined from the plaintiff's motion for summary judgment, its contentions are threefold. First, it says that the Board failed adequately to consider plaintiff's assertion that the contract was in fact impossible to perform even if only for a short time and such failure was error within the purview of Section 1 of the Wunderlich Act. Secondly, it asserts that the Board erred as a matter of law within the purview of Section 2 of the Wunderlich Act in holding that the indefinite nature of the supervening impossibility did not serve to void the contract existing between the parties. Finally, it contends that the Board erred as a matter of law within the purview of Section 2 of the Wunderlich Act by holding that the "Default" [2] clause of the contract provided the sole remedy for the plaintiff.

It is not clear from plaintiff's motion and supporting argument whether its assertion of error with respect to the Board's treatment of the "impossibility" issue is being characterized by plaintiff as one of law or of fact.

This court's several decisions in that area have been somewhat flexible, depending on the underlying facts. *See,* for example, *Koppers Co. v. United States,* 405 F.2d 554, 186 Ct.Cl. 142 (1968) (issue of fact); *Tecon Corp. v. United States,* 411 F.2d 1271, 188 Ct.Cl. 436 (1969) (issue of fact); *Stock & Grove, Inc. v. United States,* 493 F.2d 629, 204 Ct.Cl. 103 (1974) (primarily an issue of fact, although with legal overtones); *Foster Wheeler Corp. v. United States,* 513 F.2d 588, 206 Ct.Cl. 533 (1975) (mixed fact and law); *Natus Corporation v. United States,* 371 F.2d 450, 178 Ct.Cl. 1 (1967) (question of law). In the present case, however, the underlying facts are not disputed. The question then is whether those undisputed facts amount to a showing of legal impossibility, generally considered to be a legal issue. *See Natus Corp.* above.

■ The plaintiff insists that the Government admitted the contract was impossible of performance, but this is not true. While the Government did stipulate that during a period of two months the epoxy resins needed for the performance of the contract at that time were in fact unavailable, such a stipulation is quite different from a concession that there was legal impossibility of performance. Had there been, in fact an impossibility of performance, it would probably be necessary to remand the case to the Board.

■ However, it must be apparent that a determination of whether a contract is impossible of performance can not be made from the narrowly constricted view urged by this plaintiff. Otherwise, *any short-term interruption* in contract performance could be viewed as making performance legally impossible *at that particular time*

---

1. The decision of ASBCA, Division 5, to deny the appeal was unanimous. One member concurred only in the result, however, on the rationale that any right which plaintiff might have had to cease performance on the basis of impossibility was waived when plaintiff continued performance after the epoxy resin became available.

2. The plaintiff's motion refers to the "Disputes" clause in this regard. The context makes clear, however, that such reference was intended to be to the "Default" clause.

with all the attendant legal consequences. The Board correctly held that, even though for a period of a little over two months epoxy resins were unavailable to plaintiff, that unavailability was "one of relatively short duration," so short as not to cause the contract to lapse. From that uncontrovertible fact, the Board properly concluded that the time extension granted under the Default clause provided an adequate remedy to plaintiff.

As a secondary theory of recovery, plaintiff asserts that the present case is similar to the situations considered by this court's decisions in *Merritt-Chapman and Scott Corp. v. United States,* 192 Ct.Cl. 848, 429 F.2d 431 (1970) and *Fruehauf Corporation v. United States,* 587 F.2d 486, 218 Ct.Cl. —— (1978). Plaintiff's contention appears to be that, because of the nature of the delay, this court should find a constructive change under the Changes clause (which clause was, in fact, present in the contract) or that there was a constructive suspension of work (although admittedly the contract here contained no Suspension-of-Work clause).

■ In both of the cases cited by the plaintiff, this court found the contractors entitled to recover costs incurred due to an undeclared but constructive suspension of work with resulting disruption and delay to the contractor. In essence, the holding in those cases to the effect that, where the parties have contracted to allocate the risk of performance interruptions through the medium of a Suspension-of-Work clause, the Government may not avoid the effect of such allocation by unreasonably refusing to formally declare a suspension of work despite actual delays of an unreasonable duration stemming from causes not the fault of either party.

■ While in *Merritt-Chapman* and *Fruehauf,* as in the instant case, there were performance interruptions not attributable to the fault of either party, the similarity ends there. The most important dissimilarity is that in both *Merritt-Chapman* and *Fruehauf,* the contracts contained a Suspension-of-Work clause. The contract in the instant case contained no Suspension-of-Work clause nor any other provision authorizing compensation for the contractor's increased costs resulting from delay. As this court stated in *Broome Construction, Inc. v. United States,* 492 F.2d 829, 203 Ct.Cl. 521 (1974):

> In this the board was clearly correct. It also ruled that in the absence of a suspension-of-work or other similar provision designed to compensate a contractor for increased costs resulting from Government-caused delays, the board did not have jurisdiction under the disputes article to compensate a contractor for such delays. This, too, is a proposition of law so firmly established as to require no discussion or citation here. [492 F.2d at 832, 203 Ct.Cl. at 526.]

Clearly, where the Board lacked jurisdiction to entertain the plaintiff's contention, it did not err in failing to take the course urged by plaintiff.[3]

As previously stated, the present contract did include a Changes article, and plaintiff cites language from *Merritt-Chapman* to the effect that even absent a Suspension-of-Work clause, under the Changes or Changed Conditions clauses, an equitable adjustment may be had for increased costs due to disruption caused by a change or changed condition.

The plaintiff's reliance is misplaced. The present contract did not contain a Changed Condition clause and the Changes clause applies only where there has been a change-order which there has not been in this case. Thus, we are left with a situation involving a contract containing no suspension-of-work clause, there was not an unreasonable delay as was true in *Merritt-Chapman* and *Frue-*

3. In addition to the fatal lack of a clause authorizing delay compensation, the plaintiff's contention fails because the delay in the instant case was not "unreasonable" as required by the cited cases. *Merritt-Chapman* involved delays of 14 months and the delays in *Fruehauf* amounted to 15 months. In the instant case, the plaintiff's performance was interrupted for only two and one-half months.

*hauf,* and, while neither party was at fault in the delay caused by the oil embargo, such delay was clearly not for the convenience of the Government. Hence, *Merritt-Chapman* and *Fruehauf* have no application to this case.

Accordingly, the Board's denial of plaintiff's claim must be sustained.