902 F.2d 44
 Unpublished Disposition
NOTICE: Federal Circuit Local Rule 47.8(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
ALASKA UNLIMITED COMPANY, Appellant,
v.
The UNITED STATES, Appellee.
 No. 89-1560.
 United States Court of Appeals, Federal Circuit.
 April 25, 1990.
 
 Before NIES, MICHEL and PLAGER, Circuit Judges.
 MICHEL, Circuit Judge.
 
 DECISION
 
 1
 Alaska Unlimited Co. (Alaska) appeals the decision of the Armed Services Board of Contract Appeals (Board) denying Alaska's claims for equitable adjustments and time extensions of its Air Force base runway construction contract with the U.S. Army Corps of Engineers (Government). See Alaska Unlimited Co., ASBCA Nos. 32593 and 32669, slip op. (Mar. 31, 1989). We reverse in-part, vacate in-part, and remand.
 
 OPINION
 I. Spreader Claim
 
 2
 This claim involves contract interpretation, a question we review de novo. 41 U.S.C. Sec. 609(b) (1982); see United States v. Boeing Co., 802 F.2d 1390, 1393 (Fed.Cir.1986). Once an ambiguity is detected in a contract, as a general proposition the ambiguous portions of the contract should be construed against the drafter, the Government in this case. See United States v. Seckinger, 397 U.S. 203, 210-11 (1970).
 
 
 3
 We conclude that the contract was ambiguous as to whether Specification Sec. 02233, p 12, which specified an "approved spreader," required a mechanical spreader (paving machine) to lay base course or permitted use of other types of spreaders. Further, we conclude that Alaska's interpretation that other types of spreaders could be used was reasonable. We disagree with the Board's conclusion that to interpret the contract as Alaska did would render meaningless p 3.4, which defines the requirements for mechanical spreaders that could be used on this contract. See Alaska, slip op. at 7. That provision could simply have been included to define for a contractor who elected to use a mechanical spreader which ones would be "approved."
 
 
 4
 Moreover, Alaska's interpretation, which was the basis for its bid price, is reasonable because it has shown that (1) contract language in p 3.3 appears to anticipate the use of other spreaders; and that (2) the customary practice in runway construction, including for the U.S. Air Force, the ultimate consumer here, is to use trucks and graders, not mechanical spreaders, to place base course. Further, there is nothing in this contract that explicitly precludes Alaska from laying the base course in the customary way--with trucks and graders. We therefore reverse the Board's decision and hold that Alaska is entitled to an equitable adjustment and a time extension because the Government required Alaska instead to use a more costly mechanical spreader. We remand for the Board to quantify the equitable adjustment and the time extension.
 
 II. Base Course Delay
 
 5
 The Board's finding that the Government had not "ordered" Alaska to shut-down is supported by substantial evidence. However, this conclusion was considered dispositive and the Board failed to consider whether Alaska was constructively shut-down. The Government need not expressly order a contractor to shut-down operations for a constructive suspension to occur. Compensation for a constructive suspension is required when the government's conduct unreasonably delays a contractor's progress. See Fruehauf Corp. v. United States, 587 F.2d 486, 493-95 (Ct.Cl.1978). Here, the Board simply found that the contracting officer's representative, Wilson, had not "ordered" Alaska to shut-down; that Wilson's surveillance reports lack any mention of a shut-down; and that Alaska employees, Karr and Sternberg, "misinterpreted Mr. Wilson's statements." Alaska, slip op. at 16 (Findings of Fact 9, 10). Although these findings are supported by substantial evidence and in turn support the conclusion that a formal shut-down was not directed, they do not require or lead to the conclusion that Alaska was not constructively shut-down. Because Wilson may not have intended a shut-down, he would have no reason to note a shut-down in his reports. Moreover, because Alaska's employees may have not interpreted Wilson's statements as he intended does not mean their interpretation was unreasonable.
 
 
 6
 The Board failed to address whether or not Alaska reasonably interpreted the Government's conduct as constituting a constructive shut-down. We therefore vacate the Board's decision on this claim and remand for consideration of whether a constructive shut-down of Alaska's base course operation arose from the Government's conduct between August 1 and 11, 1985. An affirmative answer by the Board should be followed with a determination of the duration of allowable delay.
 
 III. Three-Day Asphalt Production Delay
 
 7
 A question of contract interpretation must first be resolved before we can decide the issue involving defective asphalt. We conclude the contract places partial responsibility on the Government to ensure satisfactory asphalt is produced. Specification Sec. 02556, p 13.1, requires the contracting officer to specify the job mix formula (JMF). Accordingly, Alaska is not responsible for any defects caused by the JMF. See United States v. Spearin, 248 U.S. 132, 136 (1918). On the other hand, the contract places full responsibility on Alaska to properly prepare the mix once given the JMF. This contractor responsibility is evidenced by the contract's requirement that Alaska's aggregate pass numerous fracture tests, thereby assuring that Alaska is using proper ingredients for the mix. The stability requirement for the asphalt itself, however, provides a quality control measure that both the Government and Alaska are meeting their respective contract responsibilities and that a reliable runway will be constructed. If the asphalt fails the stability tests, as it did in this case with the first JMF, the cause can be either an unsatisfactory JMF selection by the Government or improper ingredients or asphalt preparation by the contractor.
 
 
 8
 The Board, however, effectively placed all responsibility upon Alaska to ensure that the stability requirement was satisfied. Moreover, the Board erred in concluding that it was "unclear as to why the [asphalt] failed to meet the stability requirement." Alaska, slip op. at 24. The Board had already found that the aggregate met the fracture specifications. Id. at 22 (Finding of Fact 18). Moreover, there is no dispute that Alaska's asphalt plant was calibrated in accordance with the first JMF, and that the second JMF, which additionally included mineral filler, produced an asphalt meeting the stability requirements. Accordingly, the only reasonable inference is that the Government's selection of the first JMF without filler caused the stability test failures.
 
 
 9
 Finally, we are unpersuaded by the Government's argument that because one of Alaska's employees assisted the contracting officer's representative in selecting the first JMF, the Government should be relieved of its contractual responsibilities regarding JMF selection. Accordingly, we conclude that the Government was responsible for the asphalt production delay. Its length of three days is not disputed. We therefore reverse the Board's decision and hold that Alaska is entitled to an equitable adjustment and a three-day extension of time. We remand for a determination as to the size of the equitable adjustment.
 
 COSTS
 
 10
 The Government will bear costs.